UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 3:10cr63(JCH) |
| | : | |
| | : | |
| WILLIAM OEHNE | : | MAY 26, 2011 |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

**Preliminary Statement**

   The United States submits this sentencing memorandum in connection with the May 31, 2011 sentencing of defendant William Oehne ("Oehne" or "defendant").  The Government respectfully requests that Oehne be sentenced to a term of incarceration approximating the Guidelines calculation of 50 years. Oehne's crimes have imposed an indelible and painful harm on a child (hereinafter "M.V."), whom he began abusing when she was only eight or nine years old.

   Oehne stands before this Court for sentencing, having committed two separate and distinct crimes.  First, he sexually abused M.V. and photographed the abuse.  Second, he utilized peer-to-peer networks on the Internet to distribute the abusive images of M.V.  By creating a permanent record of the harm and distributing the abusive images, Oehne has ensured that M.V.'s victimization will continue for the rest of her life.  She will be compelled to endure the continual world-wide circulation and possession of the abusive images by an ever-increasing number of offenders and will be powerless to control their dissemination.  Indeed, many state, federal, and international law enforcement agencies have already reported that M.V.'s images have been located by offenders in their jurisdiction.  Each of these crimes has caused great harm to M.V., and Oehne should be punished separately and consecutively for them.

   In this case, M.V. was forced into submission and silenced because Oehne placed himself in a position of trust and authority by initially dating M.V.'s mother and subsequently moving into M.V.'s mother's home.  Over time, Oehne successfully broke down M.V.'s defense

mechanisms by engaging in a lengthy period of grooming, which included, among other things: (1) desensitizing her to sexual acts by showing her pornography; (2) touching her; (3) telling her that she could be a model and taking photos of her; (4) taking her to a nude beach; (5) claiming to play pranks, including walking in on her while she was showering; (6) taking her to the mall and buying her things; and (7) walking around the house nude and talking about his nudist philosophy.

In statements made to law enforcement at the time of and subsequent to his arrest, Oehne has engaged in a pattern and practice of repeatedly deflecting blame and minimizing his conduct. Incredibly, Oehne has redirected the blame toward both M.V. and her family members. At the time of his arrest, Oehne, stated that M.V.'s biological father was likely responsible for the abusive images; then he stated that M.V.'s mother neglected her and that he was the only one who cared for her; and he shamefully tried to claim that it was in fact M.V. who seduced him and even suggested that he was powerless to refuse. In fact, the only plausible explanation for his conduct is that Oehne is a dangerous sexual predator who preys on the most vulnerable in our society.

Because these abusive images cannot be removed from the Internet, Oehne's crimes have ensured that M.V. will be re-victimized each time they are viewed or distributed to other offenders, and she will therefore likely be subjected to the attendant physical and emotional suffering for the rest of her life.[1] See *New York v. Ferber*, 458 U.S. 747, 757 (1982) ("[p]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ( "the victimization of children

---

[1] "The illegal production, transportation, distribution, receipt, advertising and possession of child pornography, as defined in section 2256(8) of title 18, United States Code, as well as the transfer of custody of children for the production of child pornography, is harmful to the physiological, emotional, and mental health of the children depicted in child pornography and has a substantial and detrimental effect on society as a whole."

Adam Walsh Child Protection and Safety Act of 2006, Pub.L. No. 109-248, § 501, 120, Stat. 587, 623 (2006).

involved [in child pornography] does not end when the pornographer's camera is put away. . . . The pornography's continued existence causes the child victims continuing harm. . . ."); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249 (2002) (child pornography is "a permanent record of a child's abuse, [its] continued circulation . . . would harm the child who has participated. Like a defamatory statement, each new publication . . . would cause new injury to the child's reputation and emotional well-being.").

## Factual Background

On or about January 13, 2006, an agent of the Federal Bureau of Investigation ("FBI") forwarded to the National Center for Missing and Exploited Children ("NCMEC") child pornographic images that the agent had located while in an undercover capacity on the Internet. On January 17, 2006, additional images of the same victim were forwarded to NCMEC by an INTERPOL child exploitation working group in Lyon, France. INTERPOL was able to find identifying information after magnifying the photographs. In one image, M.V. was standing in front of a plate with M.V.'s first name and birth date. A separate image of M.V. depicted a "Mickey Mouse" hat with M.V.'s first name stenciled on the back. Utilizing the information received from various law enforcement officials, the FBI identified individuals in the United States who matched the first name and date of birth identified on the plate. In March 2009, after many failed attempts, Special Agents from the New Haven Field Office were able to identify M.V.'s likely residence in Fairfield County. They learned that a state agency had initiated a sexual abuse inquiry in or about 2007 based on speculations that Oehne may have abused M.V.; the inquiry was closed when M.V. denied any such abuse in an interview with state employees . Based on this information, FBI attempted to locate Oehne and learned that he was residing in Virginia, where he was free on a state bond for charges relating to the sexual abuse of a fifteen-year-old.

On March 30, 2009, an FBI child/adolescent forensic interviewer interviewed M.V. to determine the identity of her abuser. During the forensic interview, M.V. admitted that

Oehne began to sexually abuse her a few months after he moved into her home, and she provided details about the abuse. The agents were also able to corroborate that many of the images were taken in M.V.'s bedroom.

On March 31, 2009, agents interviewed M.V.'s mother, who confirmed that Oehne lived in her home with M.V. for significant periods of time from May 2003 until in or about May 2007. M.V.'s mother also confirmed that she had observed suspicious activity, which included Oehne: walking around the house so that M.V. could see him nude; watching M.V. changing her clothes; walking in to the bathroom when M.V. was in the shower; and buying many gifts for M.V. The mother also stated that Oehne would borrow her camera and that Oehne was computer savvy. Agents obtained consent and searched the camera; a forensic review of the camera revealed many pornographic images of M.V.

On the same day that M.V.'s mother was interviewed, – the day after M.V. was interviewed - law enforcement officers in Virginia were able to locate Oehne at his residence in Virginia. The agents spoke to Oehne on that date and also executed a search of his residence. Initially, Oehne denied any wrongdoing but after being confronted with images and after certain evidence was found at his residence, including rings that Oehne had worn that could be seen in some of the abusive images, Oehne made some admissions but continued to minimize his conduct. In his handwritten confession he wrote:

> [M.V.] asked me to take photos of her and they unintentionally got uploaded to Limewire. There was never any sexual relations with her, and I did the photos to make her happy. There was never any other abuse. There was never any penetration of any of her body parts. Upon discover of the Limewire upload I immediately deleted the Limewire program. I feel horrible for any hardships this has caused anyone and there was never any intention of uploading or sharing photos. I am truly sorry for everything that has happened.

In July 2009, several months after Oehne's arrest, law enforcement agents again spoke to Oehne in the presence of his attorney. During this interview the lengthy grooming process and manipulation tactics became evident. In a post-arrest statement, Oehne admitted to being a nudist and to walking around the house nude. He talked about how he played "pranks"

with M.V., including throwing cold water on her when she was in the shower. He admitted to rubbing M.V. when she would sit on the couch and patting her behind. In an effort to distort the facts and redirect the blame on M.V., Oehne talked about rubbing M.V. though her underwear and said "she seemed to like it." Oehne said he took pictures of M.V. because he believed that she could be a model. He talked about how he would put her to bed. Perhaps most offensively, Oehne said that M.V. was responsible for directing all of the abusive poses that he engaged in and photographed. Oehne went so far as to say that M.V. watched pornography on a laptop and that is where she may have gotten her ideas.

When Oehne was confronted with sanitized images of the abuse that he had inflicted, he subsequently admitted that he performed oral sex on M.V. and that he masturbated in front of her. He also admitted that M.V. put her lips on his penis but he remained unwilling to acknowledge what appears to be actual rape.

Oehne also discussed other disturbing events, including the fact that he met an adult male during a visit to a nude beach where he brought M.V. The adult male told Oehne that he was a pornography actor interested in viewing images of young girls. In response, Oehne sent the adult male fifteen to twenty photos of M.V. (Agents were able to locate an e-mail corroborating that Oehne sent images of M.V. to the adult male.) Oehne also admitted that the adult male later took the train from New York to Connecticut, and Oehne and the adult male drove M.V. to the mall where they bought her things and took her to a hotel in Stamford, Connecticut. Oehne claims that M.V. refused to go into the hotel.

At the time of Oehne's arrest, he consented to a search of his property. That search was the subject of a suppression hearing before the Court. During the search, the agents located, among other things, a camera, which contained images of four Virginia children. Some of the images depict non-pornographic images of Oehne with the children, but one image depicts the genital area of one of the girls and another depicts a partially nude girl who is approximately ten years old.

Each of the four girls was interviewed by child forensic examiners, and copies of the video-taped interviews were provided to defense counsel pursuant to a protective order. At least one of the four girls has said that Oehne improperly touched her, including touching her breasts. In a post-arrest statement, Oehne admitted that he met two of the four girls while moving items into his girlfriend's apartment. He admitted to taking photos of two of the girls, and he admitted that he touched their breasts. He also admitted that there was a third child present when he was taking photos and stated that he may have taken a picture of the third child with her pants pulled down but that he has not traded any of those images.

## **Legal Standard**

The Supreme Court clarified the continuing role of the Sentencing Guidelines and the scope of the sentencing court's discretion in United States v. Booker, 543 U.S. 220 (2005). Booker makes clear that this Court must consider both the sentencing factors set forth in 18 U.S.C. Section 3553(a), and the Sentencing Guidelines in fashioning a reasonable sentence. Id. at 764. While the Sentencing Guidelines are no longer mandatory following Booker, they must still be considered in determining the appropriate sentence. The Second Circuit has recognized the continuing relevance of the Sentencing Guidelines following Booker in determining an appropriate sentence:

> [I]t is important to bear in mind that Booker/ Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. United States v. Crosby, 397 F.3d 103, 113-14 (2d Cir. 2005).

Under the non-mandatory Guideline regime established by Booker and Crosby, the sentencing judge is empowered to make the factual findings necessary for determining what

the recommended Guideline sentence is in a particular case. Crosby, 397 F.3d at 113 ("the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence").

The PSR properly calculates the Guidelines range as follows.

> U.S.S.G. § 2G2.1 - base level offense . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
>
> U.S.S.G. §2G2.1(b)(1)(A) - victim under age of 12 . . . . . . . . . . . . . . . +4
>
> U.S.S.G. §2G2.1(b)(2)(A) - commission of sex act . . . . . . . . . . . . . . . +2
>
> U.S.S.G. §2G2.1(b)(3) - offense involved distribution. . . . . . . . . . . . . . +2
>
> U.S.S.G. §2G2.1(b)(4) - sadomasochistic conduct[2] . . . . . . . . . . . . . . . . +4
>
> U.S.S.G. §2G1.3(b)(1) - minors were in the custody, care,
> or supervisory control of the defendant. . . . . . . . . . . . . . . . . . . . . . . . . +2

---

[2] A district court can apply the sadistic enhancement under USSG 2G2.2(b)(4) solely on the basis of an image depicting sexual contact with a prepubescent child. The reactions of the people in the image are not relevant. The district court, however, must make a finding that the depicted activity would have caused pain to the minor. In *United States v. Freeman*, 578 F.3d 142 (2d Cir. 2009), the Second Circuit upheld a district court's decision to apply the sadistic enhancement. The district court found that the sexual contact in the image "would have to be painful" to the children depicted, some of whom appeared to be as young as six or seven years old. *Id.* at 147. The Second Circuit held that the determination of whether an image is sadistic under U.S.S.G. § 2G2.2(b)(4) is an objective one. *Id.* at 146. The "purpose of the act depicted [and] the reaction of the actor" are irrelevant to this determination. *Id.* A sentencing court needs only to find that (1) an image depicts sexual activity involving a minor and (2) the depicted activity would have caused pain to the minor. *Id.; see also United States v. Delmarle*, 99 F.3d 80, 83 (2d Cir.1996), (upheld the sadistic enhancement by concluding that anal penetration of eight- or nine-year old boy "would have to be painful."); *United States v. Jones*, 210 F.3d 356, 356 (2000) (upheld the sadistic enhancement for images that depicted adult men engaged in sexual intercourse with prepubescent girls and the insertion of objects in the vaginas of prepubescent girls); *U.S. v. Rearden*, 349 F.3d 608, 615 (9th Cir. 2003) (held that a district court can apply the sadistic conduct enhancement any time images portray the penetration of prepubescent children by adult males because such images are necessarily pleasurable for the participant and painful for the child.); *Id.* at 615 (district court found from examining the pictures "that they show sadistic acts, both because the act itself must necessarily be a painful one, and physical and, also, because it's a painful psychological and emotional experience."); *See, e.g., United States v. Lyckman*, 235 F.3d 234, 239 n. 22 (5th Cir.2000) ("One hardly requires a medical degree to ascertain that vaginal intercourse with an adult male would involve pain, both physical and emotional, for a young girl."); *United States v. Caro*, 309 F.3d 1348, 1352 n. 1 (11th Cir.2002) (surveying legal landscape and concluding that "no circuit requires expert medical testimony in determining whether child pornography, which a defendant possessed, was sadistic").

    Acceptance of Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<u>-3</u>

    Total Offense level:                                            43

A criminal history category I and offense level 43 will result in a life sentence under the Guidelines. The statutory maximum is 50 years for both offenses. Therefore, the Guideline calculation is 50 years.

    **A.**  <u>**The Nature and Circumstances of the Offense**</u>.

The Supreme Court has consistently recognized that the protection of children is a paramount governmental and societal interest and the permanent record of abuse created by child pornography creates a pervasive harm that revictimizes a child. *See New York v. Ferber*, 458 U.S. 747, 757 (1982) ( "the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."). Indeed, well before the widespread circulation and increase of child pornography as a result of the Internet, the Supreme Court recognized:

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. Additionally, once an image is placed on the Internet, it can never be removed and becomes a permanent record of the abuse inflicted upon that child. Each and every time such an image is viewed, traded, printed, or downloaded, the child in that image is re-victimized. Moreover, the images continue to circulate as the child becomes an adult and hopefully begins a path towards recovery from the crimes inflicted upon them. The physical and psychological harm to children depicted in these images is incalculable, and the continual circulation of images harms children in a manner comparable to the actual production of the images. This harm is compounded and continued when child pornography images are recirculated for the personal viewing pleasure of additional offenders.

*New York v. Ferber*, 458 U.S. 747, 759-60 & n.10 (1982).

The victim in this case is left with the haunting knowledge that her images will be continuously and uncontrollably disseminated, which will only further exacerbate the psychological harm caused by the initial act of abuse. The worldwide circulation of these images

among offenders not only victimizes M.V. each time the image is viewed or distributed but it drives the market for the production of new images because these images will be used to entice other children to engage in similar conduct. *Osborne*, 495 U.S. at 109-110 ("encouraging the destruction of these materials is also desirable because evidence suggests that pedophiles use child pornography to seduce other children into sexual activity."). Throughout the short period of time that we have come to know M.V., she has experienced difficulty in school, depression, withdrawal, anger, and other psychological issues that will likely continue well into adulthood. These symptoms of distress are unfortunately all too common with victims of these crimes, as are feelings of guilt, betrayal and a sense of powerlessness and worthlessness.

### B. History and Characteristics of the Defendant.

Oehne claims that he "comes from a very close family." *See* PSR ¶ 41. While he discusses issues of extra-marital affairs and alcoholism in his family history, there is nothing that can explain his sexual interest in children. Since in or about 2004, Oehne has demonstrated a strong sexual interest in children and his willingness to sexually abuse children. He repeatedly sexually molested M.V. Moreover, a fifteen-year-old girl in Virginia has stated that Oehne engaged in sex acts with her, and it appears that Oehne may have engaged in inappropriate conduct with other children in Virginia. A mother of one of the four girls whose images were located in a camera found on the day of Oehne's arrest will likely be present in Court and wishes to speak at Oehne's sentencing. Her statements are not offered to determine relevant conduct but are offered so that the Court can gain a better understanding of Oehne's background, character and propensity to engage in contact offenses against children. *See e.g. Pepper v. U.S.*, 131 S.Ct 1229, 1239-41 (2011) (lengthy discussion about a district court's ability to consider a variety of information and to obtain as much information as possible on an individual's character, background, and conduct).[3] The Government believes that Oehne is a dangerous predator who

---

[3]   The Supreme Court has recently talked about the importance of a district court to receive
(continued...)

will take any opportunity to engage in offensive behavior against minor females.

### C. The Sentence Must Promote Respect for the Law

The sentence in this case must reflect the seriousness of the offense committed by Oehne. The sentence should provide a necessary sanction to combat the explosive worldwide growth of child pornography and the exploitation of children online. Given Oehne's complete disregard and contempt for our laws, the punishment imposed in this case should promote respect for our laws.

### D. The Court Should Consider General Deterrence

One of the factors the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). A substantial prison sentence for such conduct can serve as a powerful deterrent against the commission of these abhorrent crimes.

As outlined by the Government, Oehne's conduct will have long-term consequences for M.V. Oehne's conduct will also impact other children as offenders show these images to minors in an effort to victimize them. Unless individuals who engage in this heinous

---

[3](...continued)
the fullest information possible about a defendant's background, character and conduct for sentencing. *Pepper v. U.S.*, 131 S.Ct. 1229, 1240 (2011) ( "'[C]ourts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.' *Williams, 337 U.S. at 246.* In particular, we have emphasized that '[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' *Id. at 247.* Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.' *Wasman v. United States, 468 U.S. 559, 564 (1984).*"); *Pepper*, 131 S.Ct. at 1241-42 ("Preliminarily, Congress could not have been clearer in directing that '[n]o limitation ... be placed on the information concerning the background, character, and conduct' of a defendant that a district court may 'receive and consider for the purpose of imposing an appropriate sentence.' *18 U.S.C. § 3661.* The plain language of § 3661 makes no distinction between a defendant's initial sentencing and a subsequent resentencing after a prior sentence has been set aside on appeal. We have recognized that 'the broad language of § 3661' does not provide 'any basis for the courts to invent a blanket prohibition against considering certain types of evidence at sentencing.'") citing *Watts, 519 U.S., at 152, 117 S.Ct. 633.*").

activity understand that there are serious and certain consequences for their actions, the temptation to continue to engage in such exploitation and to prey on those are among the most vulnerable can not be tempered, let alone, eliminated. *Ferber*, 458 U.S. at 759 ("the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled."); *Osborne*, 495 U.S. at 109-110 ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand."). The Court's sentence should send a clear and strong message of general deterrence. General deterrence serves an important function, and its impact should not be underestimated particularly here where the victims are children.

### E.  Oehne Has Earned A Sentence Comparable to Those Imposed on Similarly Situated Offenders.

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences. Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7). The Guidelines here serve as a good marker for the appropriate sentence.

### F. Forfeiture and Restitution

Unfortunately, Oehne appears to have no assets that the Government can forfeit. The FBI is in possession of Oehne's computer and other hard drives. Our understanding is that the defendant will not be seeking to reclaim those items. Moreover, the victim and her family members have been informed about the availability of restitution, and to date they have made no claim. If the Court is willing to enter an order of restitution in this case, the Court can inform M.V.'s family members that they can provide a claim of an amount of restitution within 90 days to the Court.

**Conclusion**

The only appropriate sentence that would be fair and just after considering the facts and applicable 3553 factors is one close to the Guideline range as outlined in the PSR.

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY


/S/
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct24433
United States Attorney's Office
1000 Lafayette Boulevard, 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000
(203) 579-5575 (fax)
Krishna.Patel@usdoj.gov

**CERTIFICATION**

    I hereby certify that on May 26, 2011, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                /S/
                KRISHNA R. PATEL
                ASSISTANT UNITED STATES ATTORNEY