UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 3:10CR63 (JCH) |
| v. | : | |
| | : | MAY 26, 2011 |
| WILLIAM OEHNE | : | |

DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

The Defendant, WILLIAM OEHNE, respectfully files this Memorandum as an aid to the Court in sentencing scheduled for May 31, 2011 in the United States District Court, Bridgeport, CT in front of the Honorable Janet C. Hall, U.S.D.J.  The arguments presented in this sentencing memorandum are based, in part, on information presented in the pre-sentence Report ("PSR"), authored by Senior United States Probation Officer Ray Lopez and discussions with United States Attorney David Fein and Assistant United States Attorney Krishna Patel.

Part I of this memorandum discusses Mr. Oehne's background and the circumstances surrounding his case; Part II discusses the post-Booker sentencing scheme; Part III discusses objections to the pre-sentence report; Part IV presents a discussion of Mr. Oehne's applicable Federal Sentencing Guidelines range; Part V presents the alternative argument that a non-Guideline sentence should be imposed in this case pursuant to 18 U.S.C. § 3553(a); and Part VI discusses a sentencing proposal for the Court's consideration in this case.

I.      BACKGROUND and FACTUAL CIRCUMSTANCES

On October 29, 2010, William Oehne appeared in the United States District Court at Bridgeport, CT, before the Honorable Janet C. Hall, U.S.D.J., and Mr. Oehne entered guilty pleas to Counts One and Two of the Indictment in Criminal Number 3:10CR63 (JCH), which charge Production of Child Pornography in the United States, in violation of 18 U.S.C. § 2251(a) and Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2).  Count One is

punishable by a maximum of 30 years of imprisonment and a mandatory minimum of 15 years imprisonment, up to a $250,000 fine, 5 years to life supervised release and a mandatory $100 special assessment.  Count Two is punishable by a maximum of 20 years of imprisonment and a mandatory minimum of 5 years imprisonment, up to a $250,000 fine, 5 years to life supervised release and a $100 mandatory special assessment.  Mr. Oehne has been detained since his arrest on March 31, 2009.

The PSR authored by Mr. Oehne accurately describes the criminal conduct which appears in paragraphs 5 – 7.  The "Stipulation of Offense Conduct" attached to the plea agreement also accurately describes the criminal conduct in this matter.  As for Mr. Oehne's background information and developmental history, the "Offender Characteristics" represented in PSR at paragraphs 39 through 73 presents a relatively accurate representation of those characteristics, and comments will be made throughout this memorandum.

Without a doubt, the power exists under the statute and the Guidelines to deliver an incredibly severe sentence to Mr. Oehne.  It is submitted that a non-Guideline sentence, either through a downward departure or via application of 18 USC 3553(a) factors is far more appropriate here.  Mr. Oehne has been incarcerated since his arrest in this matter, and has used this time while incarcerated to greatly improve his life.  Mr. Oehne has a family with whom he continues to participate in their lives (to the extent that he can right now).  He only hopes he can obtain the opportunity to achieve release from jail through a non-Guideline sentence so he can continue to foster a positive environment for his family.  He understands that if he were to be arrested again, the penalties would only increase, he would face loneliness and misery in custody, and his children would be without their father for a much longer period of time.

The question remaining in this case is how much more incarceration, if any, is necessary to achieve a sentence that comports with the factors set forth in 18 U.S.C. § 3553(a).  The

defendant respectfully suggests, for the reasons that follow, a non-Guidelines sentence be imposed.

## II.      SENTENCING SCHEME POST-<u>BOOKER</u>

For nearly 20 years, the sentencing structure for the commission of federal crimes was seemingly cast in stone. The Federal Sentencing Guidelines, made sacrosanct by an act of Congress, were deemed mandatory edicts.  But those dictates lost their mandatory nature when the United States Supreme Court, in <u>United States v. Booker</u>, 543 U.S. 220 (2005), rendered the United States Sentencing Guidelines no longer mandatory, but advisory.   The directives of <u>Booker</u> and § 3553(a) make clear that courts may no longer uncritically apply the guidelines. The U.S. Supreme Court articulated in <u>Rita v. United States</u>, 551 U.S. 338 (2007) and again in <u>Gall v. United States</u>, 552 U.S. 38 (2007), that in sentencing, there is no presumption that the Guidelines must apply.  In <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Second Circuit reviewed <u>Booker</u> and explained how courts should now approach sentencing and the determination of a fair and just sentence.  Since the Supreme Court's decision in <u>Booker</u>, while the sentencing court is still required to consider the applicable Guidelines range, it must also consider the other factors enumerated in § 3553(a) when imposing sentence.

The <u>Crosby</u> Court has set forth the model for sentencing in the post-<u>Booker</u> world of federal sentencing.  Essentially, there are now three types of sentences a court may impose.  <u>Id.</u> at 111 n.9, 113.  First, there are sentences within the applicable sentencing guideline range. Second, there are guideline sentences that result from permissible departures pursuant to Chapter Five of the Sentencing Guidelines.  Finally, there are non-guideline sentences that are sentences that do not fall within the guideline range and do not result from permissible departures.  <u>Id.</u> Presumably, non-guideline sentences result from the consideration of prohibited factors or from

circumstances that are in some fashion outside of the broad departure authority U.S.S.G. § 5K2.0 would otherwise encompass.

To determine a sentence under <u>Crosby</u>'s model, a court must first calculate the Defendant's guidelines and consider them. Next, the sentencing court must consider whether departures are appropriate. Third, the court must decide, after considering the guidelines and all of the factors set forth in 18 U.S.C. 3553(a), whether to impose a guideline sentence (including a sentence that results from permissible departures), or a non-guideline sentence. <u>Id.</u>  It is 18 U.S.C. § 3553(a) that mandates that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the [articulated] purposes [of sentencing]."[1]

Recently, the Second Circuit made an unambiguous pronouncement regarding the Guidelines in <u>United States v. Cavera</u>, 550 F.3d 180, 2008 U.S. App. LEXIS 24714 (2008). After an en banc rehearing, the Court proclaimed the following:

> "The Guidelines provide the 'starting point and the initial benchmark' for sentencing, <u>Gall</u>, 128 S. Ct. at 596, and district courts must "remain cognizant of them throughout the sentencing process," <u>Id.</u> at 596 n.6. It is now, however, emphatically clear that the Guidelines are guidelines -- that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." <u>Id.</u> at 597. In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a)."

<u>Cavera</u>, 2008 U.S. App. LEXIS 24714 at *16 - *17.

---

[1] See, e.g., <u>United States v. Ministro-Tapia</u>, Docket No. 05-5101-cr (2d Cir. Nov. 28, 2006) (Discussion Of The Parsimony Clause; District Court Must Impose Below-the-Range Sentence If It Finds that Such a Sentence Serves the Ends of Sentencing as Well as a Guidelines Sentence).

### III.    OBJECTIONS TO THE PRE-SENTENCE REPORT.

There are objections to the pre-sentence report as they relate to Mr. Lopez's proposed application of the Guidelines in Mr. Oehne's case.  See Section IV, below.

### IV.    MR. OEHNE'S SENTENCING GUIDELINES RANGE.

Senior United States Probation Officer Ray Lopez believes that Mr. Oehne's Federal Sentencing Guidelines range is 70-87 months' imprisonment, calculated as follows:

- Counts One and Two are grouped in accordance with USSG §3D1.2(b) because the counts involve the same victim and two or more acts connected by a common criminal objective and constituting part of a common scheme or plan. As such, under §3D1.3(a), the offense level for Count One is being used because it results in the highest offense level of the counts in the group.

- Base Offense Level: The guideline for 18 U.S.C. § 2251(a) is §2G2.1. Section 2G2.1(a) establishes a base offense level of 32 for Production of Child Pornography.  **32**

- Specific Offense Characteristic: A 4 level increase applies under §2G2.1(b)(1)(A) because the victim had not attained the age of 12 at the time of the offense.  **+4**

- Specific Offense Characteristic: A 2 level increase applies under §2G2.1(b)(2)(A) because the offense involved the commission of a sexual act.  **+2**

- Specific Offense Characteristic: A 2 level increase applies under §2G2.1(b)(3) because the offense involved distribution.  **+2**

- Specific Offense Characteristic: A 4 level increase applies under §2G2.1(b)(4) because the offense involved material that portrays penetration, which is sadistic and masochistic conduct.  **+4**

- Specific Offense Characteristic: A 2 level increase applies under §2G2.1(b)(5) because the minor victim was in the custody, or supervisory control of the defendant.  **+2**

- ***Adjusted Offense Level (Subtotal):  46***

- Adjustment for Acceptance of Responsibility: Guideline §3E1.1(a), (b) calls for a three-level reduction is recommended.  **-3**

- ***Total Offense Level:  43***

Under this formulation, the total offense level is calculated at Level 43. It also appears that Mr. Oehne falls within Criminal History Category I. This would result in a Guidelines range of life imprisonment, a fine range of $25,000 to $250,000 and a term of supervised release of at least 5 years and as much as life.

It is Mr. Oehne's position that many of these enhancements should not apply. Specifically, the enhancements relating to "sexual acts" and "sadistic/masochistic conduct." Mr. Oehne also insists that the two-level enhancement for if the minor was in the custody, or supervisory control of the defendant should not apply.

## V.       A NON-GUIDELINE SENTENCE SHOULD BE IMPOSED.

In this section, Mr. Oehne wishes to present a sentencing discussion based upon the first and third branches of the Crosby sentencing model – a discussion of the Defendant's Guidelines and then a discussion of relevant factors under 18 U.S.C. § 3553(a).[2]

### A.   Mr. Oehne's Federal Sentencing Guidelines Range.

It is still unknown what exactly Mr. Oehne's United States Sentencing Guidelines range is. Mr. Lopez calculates the range to be life imprisonment. The Government is arguing essentially the same, asserting that the proper period of punishment is 50 years' incarceration.

### B.   Application of 18 U.S.S.C. § 3553(a) factors.

Section 18, United States Code, § 3553(a) provides the overall framework within which a sentencing judge must determine the appropriate sentence for a defendant. While not all of the factors contained in the statute will apply in every case, many of them do. In this case, the factors most directly relevant that the Court should consider are:

---

[2] For the record, the undersigned considered a potential departure pursuant to U.S.S.G. § 5K2.13, however the text of 5K2.13 specifically prohibits consideration of a departure for any defendant convicted of an offense under chapter 110 of the United States Code.

"(1) the nature and circumstances of the offense and the history and characteristics of the Defendant;
(2) the need for the sentence imposed:
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public;
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;"
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines…;
(5) any pertinent policy statement issued by the Sentencing Commission;
(6) the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct…

Thus, while a sentencing court must consider the applicable Guidelines sentence, there is no longer a presumption that such a sentence satisfies the objectives of § 3553(a). Significantly, neither § 3553(a) nor the majority opinion in Booker suggest that the sentencing court should give the Guidelines any greater consideration than any of the other factors contained in § 3553(a).

18 U.S.C. § 3553(a) provides that the Court "shall impose a sentence sufficient, but not greater than necessary" to achieve the goals of just punishment, specific and general deterrence, and to provide needed educational, vocational, medical care or other correctional treatment in the most effective manner. Each of these goals can be met in this case with a non-Guidelines sentence. Such a sentence would serve the goal of just punishment because it is a significant deprivation of liberty and it sufficiently punishes the Defendant's conduct in this case.

### i.   18 U.S.C. § 3553(a)(1): Nature / Circumstances / History of the Defendant

William Karl Ludwig Oehne, 50, was born in Queens, New York on March 4, 1961, the first of two children born through the marriage of William K Oehne and Marianne Koesters

(German immigrants). See PSR ¶ 40.  His father was 33 years older than his mother and his father, who worked as a butcher, died approximately 20 years ago, at the age of 83.  PSR ¶ 40. This was his father's second marriage and he has two paternal half-sisters from his father's first marriage, whom he considered to be his aunts.  PSR ¶ 40.  The defendant also has two maternal half-sisters from his mother's previous relationship.  PSR ¶ 40.

Mr. Oehne came from a very close family and lived in close proximity to his extended paternal family which led to regular gatherings with his paternal uncle and cousins.  PSR ¶ 41. Mr. Oehne's father was 65 when the defendant was born and consequently, during the defendant's childhood and adolescence, his mother was "the primary bread winner." PSR ¶ 41. Mr. Oehne was raised in North Babylon, Long Island, NY, and his mother worked long days in New York City daily.  PSR ¶ 41.  Mr. Oehne reported that he had a good relationship with his father, but, because of his age, his father was unable to do the things fathers normally do with their sons, like playing ball.  PSR ¶ 41.  During his adolescence Mr. Oehne learned his mother had an alcohol problem and this caused much friction between his parents.  PSR ¶ 44.  Mr. Oehne moved out of his parents' house because of his mother's drinking and associated behavior when he was 18, and he was 19 years old when his father died.  PSR ¶ 44.

Mr. Oehne grew up in a safe, quiet middle-class community in Long Island where he was on his own a lot.  PSR ¶ 42.  He was well behaved and was a good student.  PSR ¶ 42. Being raised in a predominantly Italian neighborhood, he was picked on a lot by his classmates in school due to his German heritage and was also considered to be a "nerd" and a "geek," by his peers because he wasn't into sports.  PSR ¶ 42.  Mr. Oehne was raised Roman Catholic and is still a practicing Catholic, actively participating in church and Bible study at Wyatt.  PSR ¶ 43.

Mr. Oehne's mother, 81, currently lives in Amelia, Virginia where she suffered a heart attack approximately one year ago.  PSR ¶ 47.  His younger sister, Judy Viglietta, 37, also lives

in Amelia, VA, as works as a veterinary technician.   PSR ¶ 47.   The pre-sentence report accurately provides information on his two maternal half-sisters.   PSR ¶ 48.

Mr. Oehne was married on one prior occasion to Christine Branham on December 15, 1984.   PSR ¶ 49.   They separated in 1996 and divorced in Manassas, Virginia in 2000. PSR ¶ 49. She presently lives in Amissville, Virginia their son, Christopher Oehne, 25.   PSR ¶ 49. Christopher is a student at the Culinary Institute in Washington D.C., and works at restaurant full time. PSR ¶ 49.   A character reference letter authored by Christopher is attached to this sentencing memorandum for the Court's review.

Physically, Mr. Oehne suffers from degenerative disk disease which was diagnosed after he arrived at the Wyatt Detention Facility. PSR ¶ 50.   The L4, L5/S1 disks are herniated and his right shoulder has also been bothering him from a work related injury.   PSR ¶ 49.   He has had neck surgery at Greenwich Hospital in March 2007, and is presently on prescription medication as a result.   PSR ¶ 50.   Additionally, other than experimenting with marijuana during his adolescence, he has never used an illegal drug nor abused alcohol.  PSR ¶ 50.

Mr. Oehne disclosed during the PSR interview that he was sexually molested by an adult male neighbor when he was 8 years old.  PSR ¶ 53.  The neighbor lived alone had the defendant come over his house, and in one occasion, the man fondled the defendant's genitals and placed his mouth on the defendant's penis.  PSR ¶ 53.  Mr. Oehne ran out of the house, never went back and never told anyone what happened to him.  PSR ¶ 53.

Mr. Oehne was evaluated by Richard B. Krueger, M.D. and was requested by the undersigned to perform a psychiatric and psychosexual evaluation of the Defendant.[3]   Dr.

---

[3] Dr. Richard Krueger is a psychiatrist with an expertise in forensic psychiatry, addiction psychiatry, sexual offenders, professional sexual misconduct, and the psychopharmacological and behavioral treatment of paraphilias and sexual disorders.  He is a graduate of Harvard Medical School and an Associate Clinical Professor of Psychiatry in the Department of Psychiatry, Columbia University, College

Krueger's report – dated March 12, 2011 – had been provided to the Court, Government and Office of United States Probation under separate cover.  In his twelve-page report, Dr. Krueger explains how he put Mr. Oehne through nineteen (19) different psychological / psychiatric tests that conduct risk assessment and test for (a) deviant and non-deviant sexual behaviors, (b) other psychiatric syndromes and (c) personality functioning.   After completing his analysis, Dr. Krueger determined Mr. Oehne to have a low risk of recidivism, stating (in pertinent part) as follows:

> Impression: My impression is that Mr. Oehne is a 49-year-old white male who was raised by German immigrant parents who were both heavy drinkers. He was a bright student in high school and married and then became a truck driver. He has had a successful career as a truck driver through the years. He has a long history [of] participation in nudist beaches.
>
> He over a two-year period engaged in the opportunistic sexual abuse of a pre-pubescent female [name redacted] becoming sexually aroused by her and taking pictures of her when she was naked.  He masturbated to these images. He engaged in actual contact of her with his penis. These pictures were uploaded onto the Internet…  Mr. Oehne clearly makes criteria for pedophilia, having had at least 6 months of recurrent, intense sexually arousing fantasies, urges or behaviors involving sexual activity with a prepubescent child, and having acted on these.
>
> Mr. Oehne because depressed after his arrest, and this depression has responded fairly well to antidepressant treatment. He reported a depression earlier, and thus has a diagnosis of major depression, recurrent.
>
> Given that Mr. Oehne has accepted a minimum sentence of 15 years, he will be in his 60's when he would be released. His risk of reoffense according to 4 well accepted actuarial instruments is low and could be reduced to remote through sex offender specific treatment and the usual conditions of monitoring applied by federal probation to sex offenders…

---

of Physicians and Surgeons.  He is also on the faculty of the Columbia-Cornell Fellowship Program in Psychiatry and the Law.  He is Medical Director of the Sexual Behavior Clinic at New York State Psychiatric Institute and an attending psychiatrist at New York State Psychiatric Institute and at Columbia-Presbyterian Medical Center.  Dr. Krueger is also a board member and Vice President of the New York State Association For The Treatment of Sexual Abusers.

> Opinion and Recommendations: Mr. Oehne makes criteria for pedophilia, but also has a very strong history of interest in adults. He is an excellent candidate for sex offender specific treatment and has a good prognosis.  His risk of another sexual crime is low, and will be reduced further by his advanced age at the time of release. It could be reduced even further to a level I would characterize as remote by sex offender specific therapy while in custody and by standard conditions of probation for sex offenders that are usually mandated as part of federal probation.

From an educational perspective, Mr. Oehne graduated from Danbury High School in Danbury, CT in 1978.    PSR ¶ 56.   The pre-sentence report at paragraphs 57-62 accurately reflects Mr. Oehne's historical employment background.

Attached as Exhibit A are character letters for the Court's review and consideration.

### ii.   18 U.S.C. § 3553(a)(2): Need For Sentence Imposed to Reflect Seriousness of the Offense and Promote Deterrence.

As for deterrence, both general and specific, this Court's sentence should be sufficient to send a message that this type of criminal conduct – on any level – will carry severe consequences.  No member of the public is likely to be encouraged to commit this crime based upon the results in this case.  Mr. Oehne's experience in this case has led to nothing but misery. He is loathe to repeat this experience and would discourage others who think it is worth the risk of getting caught.

Therefore, considering the need for the sentence to provide adequate general and specific deterrence, a non-Guidelines sentence would be appropriate. As the Second Circuit has observed with respect to the rationale of specific deterrence and the relationship between the sentence for the current offense and prior time served, "if a defendant served no time or only a few months . . ., a sentence of even three to five years for the current offense might be expected to have the requisite deterrent effect."  Mishoe, 241 F.3d at 220.

General deterrence focuses on general prevention of crime by making examples of specific deviants. The individual actor is not the focus of the attempt at behavioral change, but

rather receives punishment in public view in order to deter other individuals from deviance in the future.   Specific deterrence focuses on the individual in question. The aim of these punishments is to discourage the criminal from future criminal acts by instilling an understanding of the consequences.   From both a general deterrence and specific deterrence perspective, a non-Guideline sentence would be appropriate.

As for the goal of rehabilitation, there is no rehabilitative goal of relevance in this case that requires a sentence within the Guidelines.  Mr. Oehne asserts that a non-Guideline sentence would be sufficient to comply with the statutory mandate that the sentence be "sufficient, but not greater than necessary" to achieve the goal of rehabilitation.

### iii.    Recent Sentencing Trends: Stabenow, Grober, Dorvee, et al.

Over time, support for the rote application of the Sentencing Guidelines has begun to dwindle.  Legal scholars, among them Judges, litigators, prosecutors and defense attorneys alike, have begun to peel back the layers of the onion so to speak, to unearth the methods by which the Sentencing Guidelines were arrived at, as well as become committed to proper application of the 18 U.S.C. 3553(a) factors in effort to tease apart the worst offenders from those whose facts and circumstances mitigate against the harsh and sometime callous way the Sentencing Guidelines are applied across the board.

### A.  Stanbenow article

In his nationally recognized article, *"Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines"* July 2009, Troy Stabenow, Assistant Federal Defender for the Western District of Missouri, analyzed the history and metamorphosis of the Child Pornography Guideline in an effort to provide valuable information in understanding how we got the Guideline we have today for cases involving child

pornography.  Stabenow's paper supports the proposition that child pornography Guidelines fail in their purpose of creating a range of penalty reflective of their stated objectives.  In short, they were not arrived at using the "an empirical approach based on data about past practices" as referred to in Kimbrough v. United States, 128 S. Ct. 558, 567 (2007).  Stabenow contends that the drastic and ever increasing penalties for child pornography offenders were not the product of an empirically demonstrated need for consistently tougher sentencing.  Instead, he reveals that the upward changes were largely the consequence of numerous "morality earmarks" that were slipped into larger bills over the last fifteen years, often without notice, debate, or empirical study of any kind. *Stabenow at p. 3.* The research went so far as to uncover Congressionally mandated changes that actually prevented the Commission from implementing carefully considered modifications which would have actually *lowered* applicable offense levels.  *Id.*

The harsh child pornography Guidelines were at first formulated with the worst of offenders in mind and, over time, they were expanded to every other class of offender, without regard to research or data which reflected its propriety.  The questions raised by the Stabenow paper have begun to filter through the federal courts.  In United States v. Phinney, 599 F. Supp 1037 (E.D.Wis.)(February 20, 2009), Judge Lynn Adelman defended the decision to impose a sentence below guideline range.  While the facts of the individual case were necessarily considered, as well as the 18 U.S.C. 3553(a) factors, the Court also cited the Stabenow paper and found that: "Judges across the Country have recognized, the guideline for child pornography offenses is seriously flawed and is accordingly entitled to little respect. In this decision, I focus in particular on the guideline as it applies to offenders like the defendant Phinney, those convicted of simply possession."   Id. at 1041.  The Phinney Court opined that "this [child pornography] guideline is just as flawed as the crack guideline", id. at 1040.  For the Phinney

Court, the Court decided to follow the guidelines as they had been enacted by the Sentencing commission *before* there was congressional meddling into the issue.  Id. at 1041.

In United States v. Cruikshank, 667 F. Supp 2nd 697 (S.D.WV)(November 6, 2009), the Court noted the flaws in the formulation of the Sentencing Guidelines and discounted their creation. The Cruikshank court expressed her displeasure of the child pornography Guideline, "Because they are not based on empirical data and past practices, the Guidelines for consumers of computer-based child pornography are skewed upward.  Id. at 702.  The Cruikshank court discussed some of the flaws such as the incongruence of any assumption that the number of images factors in and somehow presupposes that someone is more likely to be a danger to a child simply by virtue of the fact that they collect images.  Id. at 700-02.

### B.  A brief historical review of the Child Pornography Guidelines[4]

In the current version of the U.S. Sentencing Guidelines, U.S.S.G. § 2G2.2 governs possession of child pornography. (In 2004, section 2G2.4, which covered strictly possession, was eliminated and section 2G2.2 revised to cover both possession and trafficking offenses.)   In 1987, when the guidelines were first enacted, possession of child pornography was not a federal crime, and the guidelines covered only trafficking in child pornography. When the U.S. Sentencing Commission first enacted a guideline for possession of child pornography in 1990, the base offense level was 10. The guideline had available one upward adjustment: two levels for images of minors under age 12, resulting in a total exposure based on an offense level of 12 and the defendant's criminal history. (U.S.S.G. § 2G2.4 (1990).)

---

[4] A fair amount of information from this section was taken from the following article: Alan Ellis and Karen Landau, *Child Pornography Guidelines Are Ripe For Challenge, available at http://www.alanellis.com/CM/Publications/Child-Pornography-Guidelines-Are-Ripe-for-Challenge.pdf).*

Since its enactment, however, the guideline governing possession and trafficking of child pornography has undergone 11 amendments.  These amendments are relatively unique: they largely resulted from congressional directives that are fairly described as legislative fiats requiring an upward modification to the guidelines.  While such congressional directives are legally permissible, guidelines adopted thereunder do not carry the weight given to guidelines developed by the commission as an expert sentencing agency working in consultation with penological and sociological experts.

The amendments also are notable for their consistent increase in both the base offense level applicable to offenses involving child pornography, and the creation of new and additional specific offense characteristics. All of the specific offense characteristics have the effect of dramatically increasing the guideline range applicable to an offender.  The increases in the mean guideline sentence between 2002 and 2007 were particularly noteworthy.  Each calendar year, the mean imposed sentence on an offender convicted of a child pornography-related offense increased by 11.9 months. See Stabenow, pg. 2.  Thus, from 1994 to 1995, child pornography offenders received a mean sentence of 36 months and the 24 offenders convicted only of possessing illegal images received a mean sentence of 15 months' confinement. (*Id*.) By 2007, the mean sentence for a child pornography offender had grown to 109.6 months. (*Id*.) This represents more than a 300 percent increase "in the *typical* imposed sentence." (*Id*.)

As a result, numerous district courts have concluded that the current version of U.S.S.G. § 2G2.2 "diverges significantly from the Sentencing Commission's typical, empirical approach," frequently producing a sentence "greater than necessary to provide just punishment."  See, e.g., United States v. Hanson, 561 F. Supp. 2d 1004, 1008 (E.D. Wis. 2008); United States v. Stern, 2008 U.S. Dist. LEXIS 102802 (N.D. Ohio Dec. 19, 2008).) Several district courts have expressed concern: "The Court is particularly troubled that the Guidelines for sentencing those

who possess child pornography 'have been repeatedly raised despite evidence and recommendations by the [United States Sentencing] Commission to the contrary.'" (<u>Hanson</u>, 561 F. Supp. 2d at 1009.) A recent study shows that "[o]ver the last six years, the mean imposed sentence on [child pornography] offenders has increased an average of 11.9 months per calendar year." (Stabenow, *supra*, at 2.)

    In addition to dramatically increasing the applicable base offense level, the changes in the guidelines have made almost every enhancement apply to almost every case. These guideline changes, in turn, cause most guideline sentences for defendants convicted of possession of child pornography to approach the statutory maximum. (<u>See</u> <u>United States v. Grober</u>, 595 F. Supp. 2d 382, 384-85 (D.N.J. 2008).) As a result, probation officers frequently recommend sentences of 97 months or more for defendants whose statutory maximum is 10 years, who fall into Criminal History Category I, and who have never sexually exploited a child.

    The U.S. Supreme Court recently emphasized that guidelines not supported by empirical data are entitled to less deference than are guidelines that exhibit the Sentencing Commission's "exercise of its characteristic institutional role" as an expert agency tasked with promulgating empirically based guidelines.  <u>See</u> 28 U.S.C. §§ 991(b)(1)(C), 994 (describing empirical starting point for promulgation of guidelines and independent development of same); Spears v. United States, 129 S. Ct. 840, 842-43 (2009) (internal quotation marks omitted).) The child pornography guidelines, like those for crack cocaine, are not based on empirical research and should receive little deference.  Several district courts have so held.  <u>See</u>, <u>e.g.</u>, <u>Grober</u>, 595 F. Supp. 2d at 392-93; <u>Phinney</u>, 2009 U.S. Dist. LEXIS 13277 at *23-24 (E.D. Wis. Feb. 20, 2009); <u>United States v. Gellatly</u>, 2009 U.S. Dist. LEXIS 2693 (D. Neb. Jan. 5, 2009).)

The guidelines achieve unreasonable sentences in several ways. First, over time, the base offense level for possession of child pornography has been increased from 10 to 18, or even 22 if the defendant is convicted of "receipt." Second, the child pornography guidelines achieve unreasonable sentences by imposing multiple enhancements that are applicable to almost every case involving the possession or receipt of child pornography, not merely those that are most aggravated. For example, the guidelines exponentially increase the number of images attributed to video files, counting a single video file as having 75 images. Thus, a defendant with only six video files is treated as possessing more than 600 images of child pornography and is subject to the maximum upward adjustment for the number of images.  (U.S.S.G. § 2G2.2, App. Note 4(B)(ii).) Third, the upward adjustments for use of a computer, an image of a child under 12 years of age, and sadistic images are applicable to almost every case. (E.g., Gellatly, 2009 U.S. Dist. 2693 LEXIS at *32-34; Grober, 595 F. Supp. 2d at 393-94.)  The upward adjustment for use of a computer is applicable generally, and not only to cases where the use of a computer makes the offense more serious, such as when a defendant uses a computer to promote or widely distribute child pornography. (Gellatly, 2009 U.S. 2693 Dist. LEXIS at *32-34.) Similarly, almost every case involves at least one image of a child under 12 and one image that falls into the category of sadistic. (Id.) These adjustments are applicable whether or not the defendant specifically intended to possess such material. (Id.) The widespread applicability of these adjustments pushes most sentences toward the statutory maximum. (Id.; United States v. Hanson, 561 F. Supp. 2d 1004, 1010-11 (E.D. Wis. 2008).)

Ultimately, the lack of empirical support for the child pornography guidelines and the general applicability of the enhancements results in sentences that are not fairly individualized. The history of legislative enactments reflect congressional concerns with the use of computers to lure minors into sex acts, the use of materials to desensitize and entice victims, and the

production of such materials. (Gellatly, 2009 U.S. 2693 Dist. LEXIS at *24.) But, the upward adjustments apply to all defendants who possess child pornography, regardless of whether they have ever attempted to exploit a minor and who simply downloaded and possessed child pornography.

The sad but true fact is that defendants who possess and receive child pornography are a particularly despised group of individuals. Their lack of popularity makes them especially vulnerable to receiving unduly harsh sentences and increases their need of effective advocacy at sentencing.

### C.  Dorvee, Grober, etc.

The Dorvee and Grober cases are have demonstrated that the traditional child pornography enhancements in the Guidelines are archaic and should not be strictly followed. Increasingly, courts are refusing to mechanically apply the enhancements, especially in its application of § 2G2.2, that result in a sentence that approaches the maximum possible penalty for the offense.

In United States v. Dorvee, 616 F.3d 174 (2010), the Second Circuit found "procedural error" in the guideline calculation and then went on to consider "substantive errors that were raised during the appeal and would be subject to consideration on remand." The Second Circuit noted that the original sentencing errors were "compounded by the fact that the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553(a) requires." Id. at 184. The Dorvee Court then went on to undertake a complete deconstruction of the child pornography guideline.

Dorvee expressly states that the child pornography guidelines are beset with "irrationality" and that "unless applied with great care, [this guideline] can lead to unreasonable

sentences that are inconsistent with what § 3553 requires." Id. at 184. The Dorvee opinion further explains that by "concentrating all offenders at or near the statutory maximum, [this guideline] eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant' and violates the principle, reinforced in Gall, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct." Id. at 187. And the Dorvee opinion finishes up by reiterating that the child porn guideline is an "eccentric Guideline of highly unusual provenance which, unless carefully applied, can *easily* generate unreasonable results." Id. at 188 (emphasis added).

All this anti-guideline language in Dorvee (opinion released May 11, 2010), as well as the relatively aggravated facts involved in the Dorvee case suggest that, in the Second Circuit, district judges ought to view the child porn guideline as an inherently suspect.

In United States v. Grober, the Justice Department urged the 3rd Circuit to reverse an extraordinary ruling by U.S. District Judge Katharine S. Hayden that said the proposed sentence of nearly 20 years for David Grober was "outrageously high." Hayden, who sits in New Jersey, set out to explore how the guidelines had gotten so harsh and ultimately held hearings over 12 days that led her to conclude that they were unworkable and unfair.

Among the flaws cited by Judge Hayden were a series of "enhancements" that, in her view, would apply in almost every case, as well as a failure to distinguish between defendants whose crime involved nothing more than downloading images as opposed to those involved in producing, selling or trading in illegal images. Ultimately, Judge Hayden issued a 46-page opinion that declared the guideline was not worthy of deference. Instead of imposing a term of 235 months, she imposed a term of 60 months. The Third Circuit has voted 2-1 to uphold

Hayden's ruling, strongly rejecting the Justice Department's argument that Hayden had abused her discretion.

There have been widespread legal articles regarding these legal developments with the child pornography guidelines. One article in particular clearly identified the strong trend that has developed among federal judges to reject the proposed super-long prison terms as draconian.[5] Shannon P. Duffy, *Appeals Courts Criticize Child Porn Sentencing Guidelines* (found at http://www.law.com/jsp/article.jsp?id=1202474036131). The article identifies the Dorvee and Grober decisions having joined the trend and declared that the child pornography guidelines are seriously flawed, or at least that a trial judge wouldn't be wrong for thinking so. Ms. Duffy goes on to state the following:

> As the sentencing guidelines for child pornography crimes have grown increasingly harsh, One of the key flaws cited by many of the judges is that the harsher penalties were imposed directly by Congress, every time the guideline was amended, rather than the usual process in which the Sentencing Commission studies an issue and proposes changes that are then subject to congressional approval. Prosecutors have been fighting the trend by urging trial judges to follow the guidelines and sometimes by taking appeals from those who don't.

> But a decision in May from the 2nd Circuit and another this week from the 3rd Circuit suggest that the Justice Department may be waging a losing battle, and that trial judges are now freer than ever to reject the child pornography guidelines in cases where the judge sees the suggested punishment as too harsh.

Litigation in this area is ongoing and will continue. In fact, on May 16, 2011, Judge Jack Weinstein released his sentencing decision in United States v. C.R., 2011 U.S. Dist. LEXIS 53497 (E.D.N.Y. May 16, 2011) in which he ruled that, in a case where the defendant pled guilty

---

[5] Here some other courts that have adopted arguments challenging the validity of the recommendations contained in the Guidelines as they relate to child pornography offenses. Some helpful cases, in addition to Grober and Dorvee, include United States v. Johnson, 588 F.Supp.2d 997 (S.D. Iowa 2008); United States v. Baird, 580 F.Supp.2d 889 (D.Neb.2008); United States v. Hanson, 561 F.Supp.2d 1004 (E.D.Wis.2008); United States v. Shipley, 560 F.Supp.2d 739 (S.D. Iowa 2008).

to distribution of child pornography, the statutory five-year mandatory minimum would be constitutionally problematic as it would violate the Eighth Amendment's prohibition against cruel and unusual punishment.   In his over 400-page decision, Judge Weinstein undergoes an exhaustive analysis of the child pornography Guidelines.   In short, he disagrees with the Guidelines as well as the mandatory minimum nature of the Guidelines in this area.   Of note are the following excerpts from that decision:

> Requiring five-years of incarceration, most of it without effective treatment, would constitute a violation of the Constitution…
>
> A five-year minimum sentence as applied to this defendant serves no legitimate penological goal. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense" and therefore, unconstitutional under the Eighth Amendment." *Graham*, 130 S. Ct. at 2028.  Neither "retribution," "deterrence," nor "rehabilitation," *id.* at 2028-2029, justifies a five-year mandated prison sentence for an adolescent, plus what could constitute lifelong strict supervised release. Excessive and unnecessary imposition of suffering and destruction of opportunity for a constructive life as a youngster constitutes cruel and unusual punishment. *See* David Gray, *Punishment as Suffering*, 63 Vand. L. Rev. 1619, 1692-93 (2010) (discussing relationship between suffering and punishment and arguing that "excessive suffering requires remediation")…
>
> One the one hand, treatment and supervision within the community are necessary for C.R. to mature into a responsible, productive, law-abiding individual.  Requiring the defendant to spend the formative years of his young adulthood in a sex offender penal treatment unit, on the other hand, presents significant risks.  Hr'g Tr. 216, Jan. 26, 2011 (Testimony of Dr. Kaplan) ("He could spend three or five-years fantasizing about 12-year-old boys and being reinforced by pedophiles . . . and come out with more of an interest in young boys.").  While the treatment program at FMC Devens will provide the defendant an opportunity for focused therapy, a sentence of five years in such an environment for an immature and impressionable defendant is counterproductive.

 This decision is relevant to Mr. Oehne's case and should be considered when fashioning a sentence here.

### D.  Statistics

The United States Sentencing Commission prints a yearly *Sourcebook of Federal Sentencing Statistics*.  This *Sourcebook* contains descriptive statistics on the application of the federal sentencing guidelines and provides selected district, circuit, and national sentencing data. Their most recent volume covers fiscal year 2010 (October 1, 2009, through September 30, 2010) and can be found on the United States Sentencing Commission's website (http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2010/SBTOC10.htm).   Of note to this case are the following charts: Length of Imprisonment For Offenders In Each Criminal History Category By Primary Offense Category (see Exhibit B), Sentence Length In Each Primary Offense Category (see Exhibit C) and Sentences Relative To The Guideline Range By Each Primary Offense Category (see Exhibit D).  These charts (especially in Exhibit D) demonstrate that courts sentence offenders in child pornography cases to non-Guideline sentences most often.  The Court should do the same here.

### F.  Application To Mr. Oehne's case

The same Guidelines discussed above would arguably apply here.  For the above reasons, the Court should not sentence this Defendant to a sentence within the Guideline range. The Court should consider a variance via a non-Guideline sentence, associated with the background of the offender and the result of his psychosexual evaluation.  As they apply to child pornography offenses, the current Federal Sentencing Guidelines are clearly full of flaws and imperfections.  As such, a non-Guideline sentence would be more appropriate in this instance.

Additionally, instead of sentencing Mr. Oehne to a lifetime period of incarceration, there are other options available to the Court that would provide for proper supervision and rehabilitative treatment without being incarcerated.  Those options include:

1.  Lifetime supervised release is now available.

2.  Broad supervised release restrictions now exist

3. Adam Walsh / SORNA registration

4. Sexually Dangerous Person Designation

Combined with Dr. Krueger's conclusion that Mr. Oehne has a low risk of recidivism, a life sentence is simply not fair here.  A long sentence for his offenses of conviction also make this Defendant himself susceptible to (sexual) abuse in prison.

**VI.      SENTENCING PROPOSAL**

William Oehne appears for sentencing after having been convicted of Production of Child Pornography in the United States, in violation of 18 U.S.C. § 2251(a) and Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2).  The Defendant requests that this Court sentence him to a non-Guideline sentence or alternatively a sentence at the low end of the applicable Guidelines range.  Such a sentence would reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense.  Furthermore, said sentence would afford adequate deterrence to criminal conduct and protect the public from this type of criminal conduct.

Furthermore, Mr. Oehne requests credit for time already served.

RESPECTFULLY SUBMITTED,
WILLIAM OEHNE


Dated:  May 26, 2011                    By____/s/_____
                                        FRANK J. RICCIO II
                                        LAW OFFICES FRANK J. RICCIO LLC
                                        923 EAST MAIN STREET
                                        P.O. BOX 491
                                        BRIDGEPORT CT 06601-0491
                                        Fed Bar #CT 00148
                                        (203) 333-6135 (phone)
                                        (203) 333-6190 (fax)
                                        fricciojd@aol.com (email)
                                        www.ricciolaw.com (site)




**CERTIFICATION**

I hereby certify that on May 26, 2011, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.   A copy of this has also been electronically delivered to Ray Lopez, Senior United States Probation Officer, Office of United States Probation, 915 Lafayette Boulevard, Bridgeport, CT.


                                        By___/s/_____
                                        FRANK J. RICCIO II
                                        LAW OFFICES FRANK J. RICCIO LLC