```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3   _____
     UNITED STATES OF AMERICA     )
 4                 Government      ) NO: 3:10cr63(JCH)
                                   )
 5   vs.                          ) May 31, 2011
                                   ) 2:10 p.m.
 6                                 )
     WILLIAM OEHNE                 )
 7                 Defendant.      )
     _____
 8                                      915 Lafayette Boulevard
                                        Bridgeport, Connecticut
 9
                         SENTENCING HEARING
10
     B E F O R E:
11                 THE HONORABLE JANET C. HALL, U.S.D.J.

12   A P P E A R A N C E S:

13

14   For the Government  :    DAVID B. FEIN
                               KRISHNA PATEL
15                             U.S. Attorney's Office
                               915 Lafayette Boulevard
16                             Bridgeport, CT  06604

17

18   For the Defendant   :    FRANK J. RICCIO , II
                               Law Offices Of Frank J. Riccio
19                             923 E. Main St.
                               Bridgeport, CT 06608
20

21

22

23   Court Reporter      :        Terri Fidanza, RPR

24

25
```

```
1          THE COURT:  Good afternoon.  Give me just a

2   moment please.  We're here this afternoon in the matter

3   of the United States of America versus William Oehne.

4   310CR63.  If I can have appearances please.

5          MS. PATEL:  Krishna Patel and David Fein on

6   behalf of the United States.  Also Special Agent Mandy

7   Fellenz of the FBI.  Also present in the courtroom is the

8   minor victim.  She's asked me to notify your Honor she's

9   in the courtroom today.  She will not be speak.  Both her

10  mother and father are here.  We also have another mother

11  who is here from Virginia.  Throughout this my request to

12  your Honor is that we only identify the minor children by

13  their first names because by providing last names of any

14  of the biological parents will reveal the identity of the

15  minors easily -- the children will be easily identified.

16  For any of the members of the public or the press this is

17  a request from the U.S. Attorney's Office that if a name

18  is inadvertently provided, in order to protect the

19  privacy and dignity of any of the children who are

20  victims in the case, that their names not be published in

21  any way and their identity not be revealed.

22         THE COURT:  Attorney Riccio, you should state

23  your appearance.

24         MR. RICCIO II:  Frank Riccio, Junior for Mr.

25  Oehne.  Mr. Oehne sits to my left.
```

1          THE COURT:  Good afternoon to you and good

2     afternoon to you, Mr. Oehne.

3          THE DEFENDANT:  Good afternoon, your Honor.

4          THE COURT:  Attorney Riccio, do you have any

5     objection to referring obviously to the victim as the

6     minor victim but referring to her parents or the Virginia

7     mother as the first name of those persons?

8          MR. RICCIO II:  No objection.

9          THE COURT:  All right.  I would ask Attorney

10    Patel if and when any of those persons address the court

11    directly if they intend to, which I'm not sure what you

12    said it is clear whether they will or not testify.  If

13    they do, they write their full name on a piece of paper.

14    If you would provide it to the clerk and she'll mark it

15    as Court Exhibits 1, 2, 3.  They will all be sealed but

16    they will be referred to only by the first name.  Could

17    you tell me who would like to speak to the court?

18          MS. PATEL:  Biological father of the minor

19    victim as well as the mother from Virginia.

20          THE COURT:  But in addition to the father, the

21    mother and the minor victim have been advised they have

22    the right to address the court if they wish to.

23          MS. PATEL:  They have.

24          THE COURT:  I should state for the record, I

25    received a written communication from the mother of the

1    minor victim in the case; is that correct?

2              MS. PATEL:  Yes.

3              THE COURT:  I received a written statement

4    within the last 20 minutes what I will describe as the

5    Virginia mother.

6              MS. PATEL:  Yes, your Honor.

7              THE COURT:  Attorney Riccio, are you aware that

8    I have received and reviewed a written statement from the

9    mother of the minor victim of the offense conduct?

10             MR. RICCIO II:  Yes.

11             THE COURT:  That very recently I received a

12   writing on behalf of the mother of a minor in Virginia?

13             MR. RICCIO II:  Yes.  Attorney Patel gave it to

14   me early this afternoon.

15             THE COURT:  That's when I got it.  Lastly I

16   should advise you that I was given about 10 minutes ago,

17   I think two pages of what I was told are copies of the

18   minor victim's diary.

19             MR. RICCIO II:  Yes, I received that.

20             THE COURT:  I want to be sure that you have

21   everything I have.

22             MR. RICCIO II:  Yes.

23             THE COURT:  I don't need to discuss what's in

24   them.  I want to make sure you have everything I have

25   seen.

1          MS. PATEL:  So the record is clear.  The two

2     pages of the diary are actually two pages from the minor

3     in Virginia.

4          THE COURT:  All right.  I wasn't aware of that.

5          Can I inquire, the minor in Virginia, when you

6     say that, is that the minor child of the mother who has

7     written the three-page statement?

8          MS. PATEL:  Yes.

9          THE COURT:  And so my understanding in the

10    Presentence Report there was reference to a minor victim

11    in Virginia who was 15.  That's not this victim.

12          MS. PATEL:  No.  In the government's memo, we

13    spoke about additional children in Virginia who conducted

14    forensic interviews for and we had provided those during

15    discovery in the case to Mr. Riccio for his review.  I

16    know that we had talked a bit about this.  I know there's

17    some issues about whether the mother of the minor in

18    Virginia can speak.  We asked under Pepper that your

19    Honor consider it.  It's become very relevant in light of

20    the psychiatric where it's self-reported no other abuse

21    to any other children.

22          THE COURT:  Attorney Riccio, are you objecting

23    to the statement by the mother of the person who claims

24    that her daughter was a victim of Mr. Oehne in Virginia?

25    It would be my view that it is not relevant conduct.  It

1    has nothing to do with the guideline calculation.  I do

2    believe under the Pepper decision as well as the Second

3    Circuit case, the name of which slips my mind right now,

4    I think it was a Judge Cabranas decision that really

5    anything that goes to the defendant's history and

6    background is relevant and it really becomes a question

7    of what I accept, what I find I guess, but that would be

8    the basis under which I would take the statement and then

9    the question, of course, not the question but you and

10   your client have a right to in effect I suppose counter

11   it if you wish to or he wishes to.  In which case, I

12   would have to make a finding about.  I guess the first

13   question assuming I got to a point where I made a finding

14   where I accepted the statement as a fact in connection

15   with the history and characteristics of Mr. Oehne, would

16   you object to that?  I don't mean you wouldn't object to

17   the finding that I made that it was proper and

18   appropriate and lawful for me to consider it in

19   connection with the sentencing.

20          MR. RICCIO II:  I agree with your analysis.  It

21   is not relevant conduct under 1(b)1.3 but I think Pepper

22   would let it in.  I think your recitation of the case law

23   is correct.

24          THE COURT:  If I made a finding, it would be

25   proper for me to consider it.

1          MR. RICCIO II:  Right.

2          THE COURT:  When I hear from the mother of this

3    Virginia child, what, if anything, you wish to respond

4    either by way of articulating his view of what happened

5    or didn't happen or whatever else you want to say about

6    it or he wishes to say about it.  I think it's a hearing

7    in that sense.  So I think you need to be aware of or

8    make him aware of that and decide what, if anything, you

9    want to do in response.  You wish the person to make a

10   statement or that would be it.

11          The first thing I want to do is I have read

12   obviously the Presentence Report.  I have read the

13   defendant's sentencing memorandum, the government's

14   memorandum.  I read Dr. Krueger's report.  I have read

15   quite a few cases.  I read the materials that I referred

16   to I received today.  I went back and read a small

17   section of the Plea Agreement record and I want to be

18   sure there's nothing else that I should have reviewed

19   that I failed to mention.

20          MR. RICCIO II:  Nothing further for the defense,

21   your Honor.

22          MS. PATEL:  Nothing from the government, your

23   Honor.  We just take note your Honor sat through the

24   entire suppression as well in this case.

25          THE COURT:  Yes.  I apologize.  I also looked at

1    15 images this morning.  They were marked one through 15.

2    I believe Attorney Riccio had the opportunity to see

3    them.  You looked at the ones I saw.  I think the agent

4    accommodated you and you saw them before she came to me.

5    So I saw 15 images.  I hope you know what I saw.

6            MR. RICCIO II:  This morning at 10:45 Agent

7    Fellenz and I did review the images.

8            THE COURT:  I failed to mention I had done that.

9    The first thing I would like to ask counsel is to review

10   everything they filed on the public docket.  There's

11   people's names, addresses all over the record.  If you

12   want help, I will be glad to red line what you filed.  So

13   but that should be done this afternoon and redacted

14   versions should be filed and the ones that are on the

15   docket should be sealed promptly.  For example, I believe

16   in your filing in some of attachments, Attorney Riccio,

17   there are addresses of people.  I believe in the

18   attachments to yours, Attorney Patel, there may only be a

19   reference to a fist name.  I don't know that first name

20   is on the public record.  Maybe it is.  I was concerned.

21   I have a series of questions.  This is going to be

22   unusual.  I usually don't approach sentencing this way.

23   I have a page and a half of questions that are in no

24   particular order.

25   I would like to get answers to them before I begin my

1    normal sentencing proceeding.  My first question is

2    whether the defendant disputes the claim of the

3    government that the set of images that were uploaded with

4    respect to the minor victim are the second most prolific

5    set of Internet child pornography.  How you would know

6    that?  But I'm really asking whether you have any basis

7    to contest it.

8              MR. RICCIO II:  Well, Mr. Oehne contests that

9    insofar as I have never seen the top 10 list, if you

10   will.  I know what the number one most traded series.  I

11   know that agents from the government and some information

12   provided by the government has suggested it is the second

13   most prolific series.  I don't have a basis to contest

14   that but then again I don't have any data that suggested

15   that's correct.  I'm not saying they are providing

16   misinformation but I know that that has been stated on

17   occasion.  I don't know how true that is.  I only know

18   for a fact what the number one series is.

19             THE COURT:  How do you know that?  How do we

20   ever know any of this?

21             MR. RICCIO II:  It is combination of statistics.

22   I imagine a combination of the Department of Justice as

23   well as various agents connected with the DOJ made that

24   determination.  I know whenever you read up on this, the

25   Disney series is number one.

1              THE COURT:  What's the basis for that assertion

2      by the government?

3              MS. PATEL:  Your Honor, I'm thinking that

4      assertion came out during the suppression hearing.  I

5      didn't put it in my memo.

6              THE COURT:  It is in the Presentence Report I

7      believe.

8              MS. PATEL:  We have from time to time we get

9      information, the FBI has a contact at the National Center

10     For Missing and Exploited Children.  I know there was a

11     period of time in this case where through conversations

12     she was one of the most prolific series in the world.  I

13     don't want to have her be the second most prolific.  I

14     think it is changing at all times and Nickmick could give

15     that and giving how many images there that would be a

16     requirement.  I do have an affidavit from Nickmick that

17     from January 2006 to March 1, 2010.  3326 offenders in

18     the United States found with her images.  I do have an

19     affidavit to that effect that I can show defense counsel

20     and your Honor.

21             THE COURT:  Go ahead.

22             MS. PATEL:  While Attorney Riccio is reviewing

23     that, I would address from the time the minor victim was

24     identified, her biological parents did opt in to receive

25     notification.  Up until November of last year, until

1   February of this year and the father would be able to

2   tell, up until February of this year how many

3   notifications he received.

4           THE COURT:  Another question I have of the

5   government.  Hand that up.  We'll make it Government's

6   Exhibit 1.

7           MR. RICCIO II:  For the record, that affidavit I

8   understand that the standard of proof is a lot lower in a

9   sentencing hearing.  Typically I would argue there's a

10  Crawford issue.  I haven't seen that before nor have the

11  ability to ask that individual questions but it is in

12  affidavit form.

13          THE COURT:  The number reported over what was

14  said verbally was in the Presentence Report.  I don't

15  think you objected to it there so.

16          MR. RICCIO II:  That's because I don't have any

17  basis to suggest otherwise.

18          THE COURT:  That would be Court Exhibit 1.   --

19  Government Exhibit 1.

20          Attorney Patel, I would like to know with

21  respect to the images I viewed, for example, in Exhibit

22  3, 4, and 5, those are within approximately a month's

23  period of time.  I don't want to say the dates out loud.

24          If you look at the date on Exhibit 1.  I would

25  like you to tell me what her age was on that date.

```
 1              MS. PATEL:  Nine years old.
 2              THE COURT:  Thank you.  Attorney Riccio, I
 3    received a copy of Dr. Krueger's report.  I believe
 4    Thursday, Friday.  I was struck by the fact that it is
 5    based upon effectively self reports of Mr. Oehne.  Would
 6    you agree with my characterization?
 7              MR. RICCIO II:  I think that's a fair
 8    characterization.
 9              THE COURT:  Would you agree with me the self
10    reports in the doctor's report and upon which the doctor
11    sets his report are not supported by other evidence in
12    the record?
13              MR. RICCIO II:  There are -- there is at least
14    one inconsistency.
15              THE COURT:  One?
16              MR. RICCIO II:  There's more than one.  I will
17    note that the information contained within was also not
18    only through self reporting but also through speaking to
19    me and other associated people like that but I understand
20    your statement.  I think your assumption is correct.
21              THE COURT:  For example, this is why I went back
22    to the plea agreement transcript.  At the report of page
23    3, the doctor said that Mr. Oehne said in 2006 he
24    discovered that the Lime Wire program is grabbing ahold
25    of images that he made of the minor victim and sending
```

1    them over Internet.  He was quite horrified to discover

2    this and deleted the images.  That's completely contrary

3    to the concession he made in the change of plea.

4             MR. RICCIO II:  During the change of plea

5    hearing --

6             THE COURT:  We took a recess on the issue.

7             MR. RICCIO II:  Yes.  There was a question of

8    whether he understood it to having been done

9    accidentally.

10             THE COURT:  Correct.

11             MR. RICCIO II:  What I can say is that Mr. Oehne

12    during this interview didn't have the benefit of what we

13    call the 302 from the proffer.  That was the same

14    document that Mr. Oehne had reviewed during that break

15    that we referred to.  I have since spoken to him about

16    that.  That's always been something that's been chief on

17    Mr. Oehne's mind  accidentally or intentionally.  He

18    understands during that interview with the government, he

19    did mention accidentally.  But he said otherwise.

20             THE COURT:  Because at the plea, I don't have

21    the exact page because I have a rough transcript, when we

22    came back from the break, I recounted where we had broken

23    off and you said that you went over things with him at

24    the break and then I say Mr. Oehne, the reason I ask you

25    this because I believe it is Count 2 requires that in

1    order to be guilty of this crime, you have to knowingly

2    mail or ship by any means interstate commerce, the

3    computer is one way and the mail is another. During any

4    of those things which I gather you don't deny these

5    images ended up in other states.  You have to cause that

6    to happen intentionally.  It can't be by mistake.  I'm

7    bad at coming up with examples but it can't be by

8    mistake.  I don't want you to say it is by mistake if you

9    meant to do it.  You are under oath.  I guess it is your

10   responsibility as is probably the best way to put it to

11   and my question honestly.  The question is did you mean

12   to send them in the sense that you knew what you were

13   doing when they somehow came from computer to be

14   somewhere on the Internet.  The Defendant:  I would like

15   to apologize for my first answer withdraw my first answer

16   and it should be yes, I did.

17          MR. RICCIO II:  He's not stating that's

18   incorrect.  He still supports that statement.  In fact, I

19   just turned to the gentleman and asked him.

20          THE COURT:  So he knew that he was distributing

21   these pictures he had taken of the minor victim on the

22   Internet?

23          MR. RICCIO II:  Yes.

24          THE COURT:  Yet he told the doctor and the

25   doctor relied upon in coming to his conclusions, he told

1   the doctor that somehow these were grabbed ahold through

2   this Limewire program and uploaded without him knowing

3   anything about it and he was horrified to discover them

4   on the Internet.

5           MR. RICCIO II:  There were e-mails that sent

6   pictures to the Internet and Limewire that sent pictures

7   to the Internet.  He had for a long time trouble grasping

8   the Limewire uploaded.  He thought it was the

9   accidentally.  After speaking to him he knows otherwise.

10  We spoke after the report was written and.

11          THE COURT:  But I guess just what I would like

12  to make clear as to this point, the doctor relied upon

13  something which Mr. Oehne would agree with me is not

14  accurate in regard to the distribution of the photographs

15  over the Internet?

16          MR. RICCIO II:  Yes.

17          THE COURT:  In addition, he told the doctor that

18  he didn't have any sexual intercourse or penetrative sex

19  or masturbated with the minor victim.  And that's at 3

20  and again at 11.  And yet the PSR at paragraph 7 reports

21  something different.

22          MR. RICCIO II:  After reviewing that, could you

23  repeat the question so I respond correctly?

24          THE COURT:  There are the statements in the

25  report that appear to be self reporting by Mr. Oehne at

1    pages 3 and 11 concerning what he did or didn't do with

2    the minor victim are an accurate description of what he

3    actually did or didn't do as set forth in the PSR at

4    paragraph 7 and then reflected in the photographic images

5    I reviewed this morning.

6          MR. RICCIO II:  In certain respects, I'm

7    referring to the fifth paragraph on page 3.  In certain

8    respects it's consistent but I understand where the court

9    sees the inconsistencies between the two.  I think that

10    when asked sexual intercourse, he gave what he thought

11    was -- could be representative.

12          THE COURT:  His view of what happened?

13          MR. RICCIO II:  Right.  But I don't think

14    that -- there are consistencies but there are also things

15    that on paper don't look like they match up.

16          THE COURT:  Can you explain to me Dr. Krueger's

17    report at the bottom of 6 and top of page 7 particularly

18    the top of page 7 in which he reports having intercourse

19    with his wife in the last week.  I presume that is

20    somebody else's report.

21          MR. RICCIO II:  I think that's incorrect because

22    if the court looks at page 6, I think he just left in a

23    couple of paragraphs that belong to somebody else.  Page

24    6 starts at the top not deviant sexual history and then

25    repetitive on page 7.

1          THE COURT:  Right.  This can't be resolved right
2     away.  I will note it as a marker before we get to this
3     by way of the hearing but Mr. Oehne in reporting to Dr.
4     Krueger denied any sexual interest in or abuse of
5     children and that he reports he was accused of something
6     in Virginia but that that was a false accusation.  So I
7     guess it can depends upon well, yeah.  It depends upon
8     what findings I make today with respect to Virginia.  I
9     do think that before we even hear from the victim from
10    Virginia, there's physical evidence, is there not, on his
11    camera of at least two minor children.  I haven't seen
12    them.  I don't know if they would qualify as pornographic
13    but they sounded sexual from the description I read.
14          MR. RICCIO II:  I'm aware of the photographs you
15    speak of.  I will say for the record and I discussed this
16    at length with Mr. Oehne including this morning.  He's
17    unsure as to whether or not Virginia is still going to
18    prosecute him for this.  He doesn't wish to say much
19    because it may incriminate him down there.  With that
20    said, the government has during the period of the case
21    provided evidence regarding that case and I viewed that
22    evidence but again by Mr. Oehne's insistence, I don't
23    wish to say much.  There might be a pending case.  If it
24    is not already pending, it may be pending in the future.
25          THE COURT:  If you would look at page 3 of Dr.

1    Krueger's report the fourth paragraph.  Beginning the

2    words however he said.  There are a number of statements

3    in there about the minor victim and her parents I think

4    and the basis for those as far as Dr. Krueger would be

5    concerned would be Mr. Oehne's completely.  Am I correct?

6         MR. RICCIO II:  That information is solely from

7    Mr. Oehne and not from any independent evidence.

8         THE COURT:  Attorney Patel, I would like to hear

9    generally your response to Dr. Krueger's report.  It is

10   the only medical or psychiatric evaluation I have in

11   front of me and it reports that Mr. Oehne is at a low

12   risk of recidivism which I think is not insignificant to

13   the sentencing decision her today.  What would you say

14   about Dr. Krueger's reporter?

15        MS. PATEL:  The court should provide it no

16   weight.  It is based on a faulty factual premise.  As the

17   court stated, it is based on the self reporting by Mr.

18   Oehne for the most part.  As we know on the law

19   enforcement side, Mr. Oehne self reported on the date of

20   his arrest which your Honor heard quite lengthy testimony

21   about what he had to say.  Initially he denied any

22   involvement whatsoever.  When confronted with the images,

23   he began to create stories about who was at fault.

24   Blaming the victim's family.  In effect, blaming the

25   victim but never quite blaming himself until more and

1    more information was brought to him.  Continuing on that

2    theme, he came in and proffered several months later and

3    again continued to minimize, deny, deflect any

4    responsibility for his actions which is clearly what this

5    report seems to the indicate as well.  Parts of it

6    particularly the paragraph your Honor has just pointed

7    out that are frankly quite offensive to actually talk

8    about any eight, nine year old girl in this way and to

9    talk about the fact it was apparently him who may have

10   been seduced and the fact that he was so powerless.  If

11   you read the report carefully, what it is basically

12   saying is he took her to the nude beach and took some

13   photographs and that's not what happened.  There's a four

14   year history of extraordinary abuse in this case so

15   because it is based on the self reporting, it is not

16   based on anything but Mr. Oehne's statements, I find it

17   amazing this doctor actually gave this report not having

18   reviewed the images in this case which were always

19   available certainly for any expert in this case.

20        The other information that is both relevant to

21   the distribution and it is a very disturbing fact in this

22   case is the fact that Mr. Oehne takes her to the nude

23   beach, meets a man at the nude beach, sends photos of her

24   to this man and the man travels from New York to

25   Connecticut where he puts the victim in the car, goes

1    with this man to buy her gifts.  We all know what that's

2    about.  And tries to take her into a hotel room.  The

3    only reason we don't know what happens is the victim has

4    a very difficult time talking about it.

5           This doctor knows little to nothing of what

6    happened in this case.  The fact of that recidivism, the

7    statement he denied any other sexual interest in these

8    children is why the Virginia information is so important

9    in this case.  We're not asking your Honor to punish him

10   for his conduct in Virginia.  We're asking your Honor to

11   understand the man that you have before you is an

12   incredible sexual predator and an incredible sexual

13   predator who has not just hurt one child, a 15-year-old

14   child there are charges and three other kids in Virginia.

15   And as a mother is going to tell you today what happened

16   to one of those kids happened in such a short period of

17   time, this is a man who is going to go directly from

18   meeting a child to any opportunity he can to abuse a

19   child and the age of these children is particularly

20   relevant.  They're always consistently eight or nine

21   years old.

22           THE COURT:  What are the images in Virginia?

23           MS. PATEL:  The images in Virginia of the mother

24   who is going to testify today of her child and we have

25   them for your Honor.  You can see her vaginal section.

1    Her pants are pulled down and see her vaginal section.

2    The other child you can see her bottom and the rest are

3    poses.  We do have them available.  The Virginia victim

4    did not speak to her parents about what happened until

5    she was interviewed by the child forensic team a year

6    later.  She talked about added things that occurred at

7    that time.

8         THE COURT:  You make an argument or a point in

9    your memorandum I believe about whether the defendant has

10   accepted responsibility and you cite to the Virginia

11   conduct but doesn't that all occur before he does a

12   change of plea here in front of me?  I don't know how

13   that affects his acceptance of responsibility unless you

14   are making a different argument and I missed it.

15        MS. PATEL:  Three points so I should say this

16   upfront so the appellate record is made clear.  The three

17   points for the acceptance of responsibility the

18   government believes he should get in this case.  So we're

19   not contesting that but whether there's a separate issue

20   as to whether or not he's shown through remorse whether

21   he's been fully forthright about his conduct and to that,

22   the government will say he's not.  That Mr. Oehne

23   appreciates the consequences of his statements and

24   actions as they impact him and because of that, he

25   actually denies or minimizes his conduct and down so

1    throughout this.  We believe all of this information is

2    very relevant to how dangerous he truly is in terms of

3    the imposition of the sentence in this case.

4            THE COURT:  We'll get to the guidelines in a

5    while but whatever I end up ruling on the objections by

6    defense counsel, the guidelines are in the stratosphere

7    and there's obviously been a series of cases that have

8    come out in the last year or two highly critical,

9    starting with the principle that guidelines that aren't

10   supported by study are really to be highly suspect.

11   Obviously we went through that with the cocaine base but

12   it appears like we're beginning a series of opinions that

13   came to the same conclusion with respect to child

14   pornography.  I think the guidelines are now described in

15   Second Circuit case law post-<u>Booker</u> the last cases talk

16   about them as being a starting point or benchmark.  I may

17   have the exact words wrong.  Should they really perform

18   that function in the sentencing given they are suspect?

19           MS. PATEL:  In this sentencing absolutely.  To

20   the extent the guidelines have been criticized, they have

21   been criticized by what I will refer to.  I don't think

22   there's a typical case.  They have been referred to as a

23   typical case that are frequently in the federal court

24   system and they range from the possession to the low

25   level distribution.  It is one spectrum.  The Dorvee case

1     is just that.  It was distribution of narcotics to an

2     undercover police officer.

3           I have two statements to make regarding the

4     issue of child sexual exploitation.  Clearly there are

5     judges out there that think the guidelines have become

6     too high, the enhancements apply so often, they might not

7     be enhancements.  My argument to that because they may be

8     applied frequently, I don't know why that means to

9     necessarily negate them.  That's not what's happening in

10    this case.  He's not the enhancement for more than 600

11    images.

12          THE COURT:  That's because he gets a higher

13    guideline range on the other crime.

14          MS. PATEL:  Because he conduct is so offense.

15    He's the worst of the worst.  He's on the other end of

16    the spectrum in this case.  We take note of the fact the

17    Dorvee decision I understand they go to disregarding the

18    guidelines or calling them suspect relying on Kimbrough.

19    The crack cocaine issue is so different from what's

20    happening in child exploitation.  The crack cocaine issue

21    the Sentencing Commission themselves said to Congress,

22    the ratio makes no sense, puts their hands up and

23    Congress still doesn't act.  That's what the Supreme

24    Court in Kimbrough is relying on.  The fact it is under

25    our Constitution it is Congress that gets to set forth

1    the penalties.  They have a system in place where they

2    have the Sentencing Commission.   The Sentencing

3    Commission comes back to them several times and says the

4    ratio makes no sense.  We don't agree with the ratio.

5    Congress refuses to do anything.   The Supreme Court said

6    that's not okay.  That's not what's happening in the

7    child exploitation world.   In the child exploitation

8    world, there's no requirement that there has to be

9    statistical empirical data but they are having testimony

10   before Congress routinely almost on a yearly basis.

11   Before the last set of changes, there was nine months of

12   congressional testimony and that was just a few years

13   ago.  This is something in a country that normally does

14   not speak with one voice and Congress that does not speak

15   with one voice, this is the area that our country speaks

16   with one voice and that voice is a loud and clear voice

17   that we're not going to tolerate the abuse of children no

18   matter how much we're feeling a tidal wave of these

19   cases.  What we have is exactly what you have before you

20   which is the worst of the worst on this spectrum.

21           In the world of online child exploitation,

22   there's nothing that Mr. Oehne has not done.   Nothing.

23   He has possessed them, he has traded them, he has

24   distributed them.  He produced them and most importantly

25   has abused here.  If there's a place where the

1    guidelines matter, this is where it is.  This is not an

2    area where this government has been asking for any type

3    of vengeance for all to images for all of the

4    distribution.  There's one charge.

5                THE COURT:  What difference does that make?

6                MS. PATEL:  The statutory maximum would have

7    been a lot higher.

8                THE COURT:  What difference would it make?  He's

9    not going to live to be 110.

10               MS. PATEL:  Your Honor's starting point would be

11   a lot higher.  The diving board is as low as we could

12   have put it because they are two very separate crimes.

13               THE COURT:  That's I think the difference.  I

14   would like to turn to Attorney Riccio.  I'm sorry I'm

15   back and forth this is a function of a lot of what I read

16   in preparation for today, I read yesterday because I

17   didn't receive it until Thursday or Friday.

18               Attorney Riccio, you talk about the criticism of

19   the guidelines.  You cite I believe five classes plus

20   Dorvee which criticize the guidelines but every one of

21   those cases is either a mere possession or a very minor

22   distribution conduct trading may be.  That's not this

23   case, is it, Attorney Riccio?

24               MR. RICCIO II:  It is not this case and --

25               THE COURT:  Have the guidelines been criticized

1    in a case where the defendant made the child pornography?

2         MR. RICCIO II:  Not that -- there have been a

3    couple.  There was a case that United States versus D

4    which was a case of the Eleventh Circuit docket 0916133

5    which March 16, 2011.  The Eleventh Circuit actually

6    used -- the panel questioned the attorneys and their

7    opinion came out and essentially took Dorvee, Grober,

8    Troy Stabenow's report and essentially said that.

9         THE COURT:  What were the facts of the case?

10        MR. RICCIO II:  That was a production case.

11   Dean was a production case.  Ultimately they said we

12   don't have to apply Grober because it is not a possession

13   case.  We don't have to apply Dorvee because it is not a

14   possession case.  We don't have to listen to what Troy

15   Stabenow says because that's not a possession case.

16   However because they want to speak on the spectrum,

17   Dorvee and Grober are possession cases and distribution

18   cases wherein Dean and in this case they are production

19   cases.  It lies in a different place on the spectrum but

20   what -- I think the question is begged in the Dean case

21   too is you are right, Grober and Dorvee and associated

22   cases aren't just possession cases and the argument is

23   why should someone who is only possessing them get the

24   statutory maximum each time.  I think the argument that

25   was said by your Honor and Attorney Patel holds true.  Is

1    there a difference?  Is there a spectrum where production

2    is on one end and possession on the other?  Yes,

3    absolutely.  Just to be clear.  This offense is a vial

4    offense.  It taints our society.  It taints the fabric of

5    our society.  But my arguments are not to justify the

6    offense.  This offense has no justification.  I think

7    what has to happen is the Court has to realize and

8    Congress has to realize.  I know the Court isn't

9    Congress.  There's no empirical data for this.  There's

10   hysteria.  Rightly so.  There's hysteria about crimes

11   against children.  I agree.  Every single time Congress

12   decides to increase their sentences, it is always a knee

13   jerk reaction.  They should be punished and they should

14   be punished severely.  But when the Pheeney Amendment was

15   passed and Freshman Senator Pheeney had 20 minutes to the

16   make the argument and it passes without any objection,

17   that's the type of thing I'm talking about.

18           THE COURT:  I was struck when I read the

19   decisions.  Judge Hayden's decision out of New Jersey,

20   whom I know well and respect, and a couple of the other

21   opinions.  I mean even the Dorvee decision.  I think

22   that's very much driven by the facts of that case.  I

23   really do.  I think it is less about we think the

24   guidelines are the wrong or Congress got it wrong than

25   say Judge Hayden's opinion.  I was struck when I read

1    Judge Hayden's opinion.  Doesn't Congress get to make

2    this decision?  I get to make the decision or I have the

3    responsibility to make it today as to the sentence for

4    Mr. Oehne, subject to review by the Second Circuit or the

5    Supreme Court as to reasonableness.

6         The record should not suggest that I don't

7    understand that I have the power to impose the sentence

8    that I think is appropriate after consideration of all of

9    the factors, and I'm not bound by the guidelines so in

10   some respects the discussion of whether the guidelines

11   are right or not, is in my view beside the point.  I

12   always calculate them and they are important and they

13   have to be calculated.  That isn't the end of the

14   analysis.  But putting that aside, having made that I

15   hope very clear, it strikes me that this is really,

16   Congress does get to decide this.  They could set the

17   guidelines it seems to me if this chose at life for the

18   mere possession of one picture of child pornography.

19   They could.  And they have effectively done that, not for

20   that crime but for crimes involving child pornography.

21   I'm not sure why I get to say that's wrong in terms of

22   the guidelines.  You may call it hysteria but there's

23   certainly I think evidence in the public record that

24   Congress relies on as to the growing menace of child

25   pornography and child abuse.  The need to either deter

1   people from doing it by large sentences or to at least

2   protect the public from further crimes by people who

3   engage in the conduct.  I guess I was struck as I read

4   the cases that you cited me to which in my opinion all

5   involved context of I put mere in quotes for the record,

6   mere possession or minor, quote unquote distribution.

7   That I don't know as a judge it is appropriate for me to

8   so second guess Congress's choice on.  That I say that

9   having second guessed their choice on crack cocaine.

10  There were studies that showed their choice was

11  absolutely wrong.  I don't have any evidence here.

12          MR. RICCIO II:  In a crack case, isn't it true

13  that in part, the crack punishments from the '80s and

14  '90s were based upon in part the hysteria that African

15  Americans get arrested for crack, sell crack, do crack

16  and so they should be punished more and it wasn't until

17  the empirical data, the Fair Sentencing Act --

18          THE COURT:  I think it was that it led to more

19  violence the use of crack cocaine.  It just happened to

20  be in the inner city among minorities.  I think the

21  stated purpose was it led to more violence.

22          MR. RICCIO II:  What was a promising move was

23  that just last year the Congress and President Obama

24  essentially said these crack --

25          THE COURT:  There's no evidence for that.

1          MR. RICCIO II:  Right.

2          THE COURT:  For the more violence associated

3     with the crack.

4          MR. RICCIO II;  Arguably was it a sign of the

5     times?  Maybe it was.  Maybe it wasn't.  What we do know

6     20 some odd years later there's more data to prove

7     there's no correlation between violence in African

8     Americans vis-a-vis crack, they shouldn't be punished as

9     harshly.

10          THE COURT:  I guess my question is the

11     legislature whether it be the state or the federal

12     legislature makes a choice, has made a choice for 200

13     plus years in this country, when you take a person's

14     life, the punishment is greater than when you slap their

15     face, okay.  They make that choice and they have decided

16     whether it was hysteria or what that the punishment for

17     murder is probably life in most instances, right?

18          MR. RICCIO II:  Right.

19          THE COURT:  And so why is it that Congress can't

20     make a choice whether you or I would agree or disagree

21     with them that today in our society child abuse is the

22     worst crime.  You know, it is right up there with murder.

23     It might as well be and therefore, they will choose to

24     impose a penalty as great as murder for pure punishment

25     say to promote respect for the law, to provide

1     deterrence, to protect the public from happening again.

2     I don't know why Congress can't make that choice.

3              MR. RICCIO II:  Correct, they can.  I was

4     thinking about this over the weekend.  We can turn on the

5     TV and hear about a homicide, it doesn't effect us too

6     much but when we hear about a case such as this one, it

7     makes us stop and want to read it.  So I think Congress

8     did what it did based upon my argument is the lack of

9     empirical data but with that said that's where 3553(a)

10    comes in.

11             THE COURT:  That's correct.  We're not bound by

12    the guidelines.  It is a bit beside the point.  Maybe I

13    was struck by the cases which I think are all that you

14    have, you don't have any others to argue to me but they

15    are quite different factually from this case.

16             MR. RICCIO II:  What about Judge Weinstein.

17             THE COURT:  That was an adolescent who was a

18    defendant I think in the case, wasn't it?  He didn't want

19    to impose a mandatory five and that was I think -- I

20    can't remember if it was possession or mere possession.

21             MS. PATEL:  Distribution I believe.  He didn't

22    want to impose a mandatory five.  This is the same Judge

23    Weinstein in jury trials told the jury what the sentence

24    is.  Judge Weinstein has made it very clear that he

25    disagrees with the child exploitation.

1          MR. RICCIO II:  Along the same lines, Judge

2     Adelman has taken.

3          THE COURT:  Out in Wisconsin.  Another judge who

4     went to judge school with me as long with Judge Hayden.

5     I read his as well.  They are both fine opinions.  I

6     won't say I agree or disagree.  I was struck as I read

7     them to the extent a guideline is a factor for me to

8     consider that I should say that Congress makes.  I can

9     depart.  I can make a judgment that I think it's based on

10    faulty reasonings or facts or whatever but at the end of

11    the day that's really nowadays post-Booker a kind of

12    wasted exercise because as you say, I have the other

13    factors that I need to look at and balance with the

14    guidelines right.

15         MR. RICCIO II:  Right.

16         THE COURT:  You also made an argument in your

17    memorandum, Attorney Riccio, that you attached something

18    happens more often in cases involving child abuse and it

19    struck me that bribery, tax and antitrust had lower

20    percentages as child pornography.  So I wondered if I was

21    misreading what you attached.

22         MR. RICCIO II:  The data that I provide is from

23    the Sentencing Commission.

24         THE COURT:  Within the guideline sentences.

25         MR. RICCIO II:  Right.  What I was attempting to

1    show was that on the range of offenses that exist in the

2    child pornography context, the court decided to impose on

3    the second page of table 27, the court decided to either

4    through a downward departure or by way of 3553(a) of

5    almost 36 percent of the time, sentence below what the

6    guideline range was.  That was the only purpose to say

7    that 36 percent of the times 3553(a) brought the sentence

8    below whatever the applicable range was.

9         THE COURT:  I don't think that's significantly

10   different than a lot of other crimes.

11        MR. RICCIO II:  I think what it shows is if you

12   look at any other one that's here.  Right below it

13   present offenses or antitrust offenses.

14        THE COURT:  Antitrust is less than 20 percent

15   within the guidelines, bribery tax, national defense are

16   all below guideline sentences.

17        MR. RICCIO II:  What it shows in more than one

18   in three, the court decided in 3553(a) that the

19   guidelines are not a fair sentence.

20        THE COURT:  I was unable to get the number of

21   convictions.  That includes both possession, distribution

22   and manufacture fall into those categories.  I was unable

23   to get information on, you know, how many times is a

24   possession that there's a departure or nonguideline

25   sentence.

1          MR. RICCIO II:  There's so very few production

2     cases so it is hard to compare.

3          THE COURT:  That's true.  I've gotten through my

4     questions.  I think that at this point I would need to

5     take whatever further offer of a factual record either

6     side wishes to make that would be together with the

7     Presentence Report.  I would then make factual findings

8     that would be a basis for the sentencing.  Not only as to

9     guidelines but again as we said under Pepper some of this

10    would go only to the history and characteristics but I

11    think I should take all of that record now and only then

12    go to the Presentence Report, the facts, the guidelines,

13    the enhancement disagreements, setting the guidelines

14    then hearing argument from both sides on all the

15    factors.

16          MS. PATEL:  What I would like to do is go ahead

17    and proceed with our witnesses.  The first witness we'll

18    refer to him as Jack.  I ask that he come to the podium.

19    I have a piece of paper in my hand.  We have written out

20    his full name.  I will ask him to sign and date it and

21    ask him to make a court exhibit.

22          THE COURT:  For the record, this gentleman is

23    the minor victim in the offense conduct biological

24    father.

25          MS. PATEL:  Yes.

1          THE COURT:  This piece of paper will be Court

2    Exhibit 1.  It will be sealed upon a finding and in

3    connection with the other request of the government that

4    names be first name as a means of protecting the identity

5    of the minor victim.  I agree with the government it is

6    necessary to keep the last name of the parents off the

7    record because otherwise the minor victim's identity

8    would be easily discoverable.  Make that Court Exhibit 1

9    sealed pursuant to my findings.  Go ahead, sir.

10          Take your time.  Would you like some water?

11          THE WITNESS:  Good afternoon, ma'am.  Thank you

12    for your time.  If I can clarify something you have

13    mentioned.  3326 notices.  I can personal vouch for 3311

14    that I have in my possession so that's pretty spot on as

15    far.  That's just the ones who got caught.  Not the ones

16    who are still out there who haven't been caught yet.

17    This is something that has torn this family apart for the

18    last two years.  It's something you wouldn't wish on your

19    worst enemy.  Stealing the innocence of the child I think

20    is far more than taking the child's life.  It leaves

21    emotional scars that will be with her for the rest of her

22    life.  Her mother very rarely leaves the house.  This by

23    some fluke or whatever got into the media.  The first

24    name was put out, the actual complex we live in was put

25    in the paper.  The only thing missing is the last name

1    and sign above the house that says scene of the crime.  I

2    lost my job after 14 years with the same company because

3    I missed so much time from work.  I'm sure he's going to

4    come up here and have somebody come up and tell about a

5    bad childhood.  My mother raised two boys in one of the

6    worst cities for crime, Camden, New Jersey.  She did

7    fine.  We both graduated high school.  We both served our

8    country in the military.  We raised our own family and to

9    some extent we came out somewhat successful.  To lay the

10   blame on somebody else. Mommy is not around.  Daddy is

11   not around.  Society in general failed me is an utter

12   line of crap.  There's no way to put it.  As an adult,

13   you make your decisions.  Live with them good or bad.

14   This is the time you pull up your big boy pants.  I just

15   wish -- this is kind of behavior we must find a way to

16   stop or send some kind of message to these parasites and

17   say this is not acceptable behavior in any society.

18   Somehow someway we must find what the end is.  Honestly,

19   your Honor, you have that power to say enough is enough.

20   Please I beg you as a father send that message and say

21   that enough is enough.

22          And last but not least, Bill has destroyed this

23   family.  He owes his family at least one last favor.

24   Whatever sentence you give him, I hope he does not die

25   quick since we have to suffer the rest of our lives so

1        should he.  Thank you, ma'am.

2                THE COURT:  Thank you very much.

3                MS. PATEL:  The second individual will be

4        identified Catherine.  It is the biological mother of one

5        of the Virginia children.  I would on a piece of paper

6        have her write her child's name as well.

7                THE COURT:  That will be marked Court Exhibit 2

8        and be sealed.  I received a typewritten statement of

9        three pages.  Is this the author of that?

10               MS. PATEL:  Yes.  You received two pages on the

11       diary.  She has the full diary here and we photocopied

12       the two relevant papers.

13               THE COURT:  Good afternoon.

14               THE WITNESS:  Good afternoon.  I'm here today

15       because I need to give my daughter and Mr. Oehne's other

16       victims a voice.  My daughter was eight years old playing

17       outside with her two friends in our backyard and I

18       checked on them.  I was doing laundry.  When I finished

19       doing the laundry, my daughter was gone.  We checked her

20       friend's homes.  She wasn't there.  We checked her other

21       friend's homes.  She wasn't there.  We checked every

22       apartment building in our complex and we found her in Mr.

23       Oehne's apartment.  We knocked on the door and when he

24       answered, I thought he had just moved in and had a child

25       of his own.  I asked him where his child was.  He replied

1    he didn't have one.  I lost it.  Immediately in my mind,

2    in my heart, I thought that something was wrong.  I

3    called my daughter to the door.  And it took her three

4    minutes it felt like to come to the door.  She was

5    painted with makeup.  And I assumed at the time that

6    there were three little girls playing dress up.  When we

7    retrieved our daughter, we went home and proceeded to

8    lecture her about not going into a stranger's home.  We

9    proceeded to tell her bad things that happened.  My

10   husband thought I was overreacting that day and told me

11   not to call the police.

12        About a year later, the FBI came to my work and

13   proceeded to show me images that were recovered from Mr.

14   Oehne's camera of my daughter.  Those pictures are burned

15   into the inside of my eyes.  Every time I close my eyes I

16   see them.  She was eight years old.  She has two parents

17   that love her and are attentive.  To this day, she's in

18   counseling.  She's afraid to go outside and play.  We're

19   afraid to let her go outside and play.  It's affected her

20   school.  She's begun binge eating.  According to her

21   counselors is her way of dealing with the things that

22   happened to her.

23        Before the FBI came to my office, my husband and

24   I found my daughter's journal.  The two entries that you

25   have, if you want to see the originals or not, an

1    eight-year-old has written.  I want to kiss him a lot and

2    good.  I think we can go to the zoo.  He would say about

3    me saying I love you and kiss me tonight.  Sex a lot.  I

4    want to have babies a lot.

5            There's another entry, dear diary, I love him a

6    lot and have babies a lot.  He's hot and sexy and there's

7    a word I don't know what she's trying to write.  Sexy

8    okay, okay, you go that.  Yeah, you got that.  An eight

9    year old doesn't come up with things like this on their

10   own.  He stole her innocence.  God only knows what else

11   happened to her that day that she couldn't tell us.

12   We're living a nightmare.

13           THE COURT:  Can you tell me the year this took

14   place?

15           THE WITNESS:  2008.

16           THE COURT:  Okay.

17           THE WITNESS:  Please I'm begging you please send

18   him away for life so my daughter can sleep at night.  She

19   has night terrors.  They wake up our whole family and our

20   adrenaline pumps so much to get up to run to her, we

21   can't go back to sleep.  I know of three victims in

22   Virginia that he's done this to.  He's a habitual.

23           THE COURT:  When you went to the door of his

24   apartment, were there two other children in the

25   apartment?

1              THE WITNESS:  The other two were in there.

2              THE COURT:  How old were they?

3              THE WITNESS:  I believe one was eight and one

4     was nine.  From what my daughter said, he offered the

5     other two toys that was the lure to get children into his

6     apartment so he can do this to them.  I found out the

7     makeup from my daughter was available was readily

8     available in that apartment.  I wish to God that day I

9     would have listened to my gut.  Maybe he would have been

10    caught sooner.  I probably would be in jail if I listened

11    to my gut in full but I'm relying on the court to please

12    punish him.  Thank you for your time.

13             THE COURT:  Thank you very much.

14             Attorney Patel, do you have the photographs from

15    Mr. Oehne's camera?  I assume that pursuant to the search

16    that I upheld after the hearing that camera was located

17    that day?

18             MS. PATEL:  It was located in the shed.

19             THE COURT:  In the shed with the hinge.

20             MS. PATEL:  Yes.

21             THE COURT:  Did Mr. Oehne identify the camera as

22    his in connection with the statement I also allowed in?

23             MS. PATEL:  In July 2009, when he spoke to law

24    enforcement agents he said it was his girlfriend's

25    camera.  He admitted taking pictures of the girl.  He

1    admitted touching two of the girls.  Said there was no

2    sexual interaction.  The girl that's Catherine's

3    daughter, he said someone took a picture with her pants

4    pulled down and later said he may have taken those

5    pictures.  He said he did not trade any of those

6    photographs.  These are the photographs.

7             THE COURT:  Have they been seen by Attorney

8    Riccio?

9             MS. PATEL:  During discovery, yes.  May I

10   approach?

11            THE COURT:  Are there a lot in there?

12            MS. PATEL:  Yes.

13            THE COURT:  Particularly ones you would have me

14   see what are relevant to what Katherine has just spoken

15   of.  If so perhaps those can be marked and returned back

16   to you.  We have Government 1 through 15 the photographs

17   I looked at should be deemed exhibits to the hearing

18   because I'm relying on them.  We can mark whatever ones

19   starting at 16.  The affidavit that I said be marked

20   Government 1 should be 16 so any further pictures would

21   start at 17.

22            MS. PATEL:  For the images you saw this morning,

23   we have sanitized images with the exact same exhibit

24   sticker.  If your Honor would prefer, we could actually

25   use the sanitized images for the court record, seal them

1  for any appellate record initially.  They can go up.

2  We'll deal with how we get the unsanitized to the Court

3  of Appeals.

4          THE COURT:  Assume the government will maintain

5  custody and control and make them available if the

6  circuit wishes to see them.

7          MS. PATEL:  Right.  We to have sanitized

8  versions.

9          THE COURT:  Those should be remarked within

10  through 15 with an R.  Those will be admitted as 1R,  2R,

11  et cetera.  They will be sealed.  The government is

12  directed to maintain custody and control of the 15 that I

13  looked at this morning which are unedited or unredacted.

14  These are of different victims, is that correct?

15          MS. PATEL:  So the record is clear, your Honor,

16  the first one is.

17          THE COURT:  Call that Exhibit 1.

18          MS. PATEL:  Yes.  That's Virginia mother's

19  daughter.  The second one is another minor who was

20  identified in that apartment who we did a forensic

21  interview on.

22          THE COURT:  Both on the same day, these were

23  taken on the day that the mother spoke of?

24          MS. PATEL:  Correct.

25          THE COURT:  You are going to have to prepare

1    redacted versions of these.  They will be Exhibit 17R and

2    18R.  I will return back to you the unredacted

3    photographs.  Those should not be marked.  The government

4    will mark them as 17 and 18 without a letter and maintain

5    possession of them.

6              Those exhibits they should be numbered 1R, 2R,

7    3R.  Also shouldn't Virginia mother's statement and the

8    two pages from the diary be marked?  Have we done that?

9              MS. PATEL:  We can do that.  I know the letters

10   sometime come in through Probation.  We can do that.

11             THE COURT:  We'll mark the statement as Exhibit

12   19 and the diary as Exhibit 20.  Does the government

13   request those two also be sealed?

14             MS. PATEL:  We do.

15             THE COURT:  Does the defendant object?

16             MR. RICCIO II:  No, your Honor.

17             THE COURT:  Does the government have any further

18   evidence they wish to put before the court?

19             MS. PATEL:  No.  I will rely on closing

20   argument.

21             THE COURT:  That's fine.  Attorney Riccio, do

22   you wish to put anything on the record by way of response

23   to the evidence presented in connection with the Virginia

24   situation which, of course, goes to 3553(a) factors or

25   any other factors that you either wish to contest or

1    which you wish to put on the record that aren't already

2    on the record.

3              MR. RICCIO II:  As far as the Virginia matter, I

4    have stated that Mr. Oehne wishes to maintain his silence

5    for the fact that there may be a pending case still.  I

6    don't think there's one now.  There could be a matter

7    reopened in Virginia.  I have at the appropriate time Mr.

8    Oehne does have a statement he wishes to read.  I have

9    Mr. Oehne's son Christopher who is here.  At the

10   appropriate time, I would like to call him forward.  This

11   doesn't have to do with any factual finding.

12             THE COURT:  We'll wait until we get to your

13   presentation on sentencing.  If Mr. Oehne wishes to speak

14   or you wish to call someone like his son, you do that at

15   that time.

16             MR. RICCIO II:  Thank you.

17             THE COURT:  All right then we need to turn to I

18   guess the Presentence Report and the question is whether

19   the government has any objections as to any of the facts

20   set forth in the report as to which might be relevant to

21   the issue of sentencing.

22             MS. PATEL:  No, your Honor.

23             THE COURT:  How about from the defense?

24             MR. RICCIO II:  Throughout the report, your

25   Honor, there were specifically in the areas regarding the

1  victim's statements, statements from parents.  There's

2  some statements made that Mr. Oehne objects to.  However

3  I don't think that goes to the heart of calculating the

4  guideline range.  Those are just victim statements so as

5  to those facts needed to calculate the guideline range, I

6  would say there's probably no objection other than just a

7  general objection, not to facts, but to the calculation

8  of the range and the facts that the numbers are what they

9  are based upon the lack of empirical data that we have

10  gone over already.

11        THE COURT:  This gets us back to the Virginia

12  problem, I'll call it for Mr. Oehne given his desire not

13  to incriminate himself as to paragraphs 33 through 36T.

14  The Probation Officer was advised, actually engaged the

15  Virginia Probation to provide information I presume from

16  police reports and other sources like that.  He's

17  recounted quite a bit of detail about another victim, a

18  15-year-old including camera images and sexual conduct.

19  Is there any objection by the defendant to that?

20        MR. RICCIO II:  There is because Mr. Oehne

21  denies that conduct.  Consistent with his rights to

22  remain silent, he doesn't wish to comment further.  I

23  think he says there's a general denial of the facts do

24  exist in paragraphs 32 through 36.

25        THE COURT:  I guess there were images on the

1      camera, were there not?  Is it his position the

2      girlfriend took these pictures?  It's represented that

3      they couldn't have been taken by the victim.  It would be

4      hard for the victim to take them with the camera owned by

5      Mr. Oehne's girlfriend.

6                  MR. RICCIO II:  Are you referring to the images

7      that the court just saw?

8                  THE COURT:  No.  I'm referring to the images

9      described in the paragraph 36 relating to the 15-year-old

10     victim who is the fourth victim in Virginia.  Having

11     heard of the mother from the younger girls, the Probation

12     Officer uncovered and reported upon conduct related to a

13     15-year-old victim and talks about a forensic examination

14     of the victim's computer and their images on the victim's

15     computer which corresponds to what she claims were

16     exchanges with the defendant and I guess the answer of

17     the defendant is he wasn't involved in any of this?

18                 MR. RICCIO II:  Insofar as paragraph 36 is

19     concerned, this is discussing images on the victim's

20     computer.

21                 THE COURT:  I understand that.  But what's found

22     on the computer of the victim corresponds to what the

23     victim describes in paragraph 33 as the defendant

24     forwarding various pictures of himself and asking her to

25     send pictures of herself.

1          MR. RICCIO II:  I can say consistent with the

2     fact that there may be a case pending in the future, Mr.

3     Oehne denies the allegations and maintains his right to

4     silence.

5          THE COURT:  Attorney Patel, on the camera that

6     was located in the shed, were there other pictures

7     involving victims?  Specifically the 15-year-old victim

8     consistent with the victim's story as recounted in 33

9     through 36.

10          MS. PATEL:  No, your Honor.  I did not have the

11     FBI do a forensic examination of that victim because it

12     was already charged conduct but we did not find any other

13     images of known or unknown children except the ones we

14     have talked about.

15          THE COURT:  Why do I credit this?  The victim

16     said this is what happened to her.  The defendant said it

17     different.

18          MS. PATEL:  The information that was provided I

19     believe to the Probation Officer was the same information

20     provided to the FBI which was done by a forensic team who

21     reviewed the computer of the victim and a camera.  There

22     was other forensic material that actually was in the

23     possession of Virginia State Police but it is based on

24     forensic review.

25          THE COURT:  What about the forensic review tells

1    me it is the defendant that did it to the victim?

2            The items were found on the victim's computer?

3            MS. PATEL:  This is the same police report I

4    read.  She identifies Mr. Oehne as her abuser.

5            THE COURT:  Why was this nolled in Virginia?

6            MS. PATEL:  I don't know.  I don't know.  I know

7    we took him.  We notified Virginia we were taking him on

8    federal charges.  I don't know if they decided to nolle

9    because he was facing federal time but I don't know the

10   answer to that.

11           THE COURT:  It was nolled a month after he was

12   taken into custody by federal arrest.  I will note that.

13           The court adopts the Presentence Report to the

14   extent it sets forth facts that are relevant not only to

15   the guideline calculation but more importantly the

16   overall decision about sentencing.  The court does credit

17   the recount taken from the police report as set forth by

18   the Probation Officer.

19           One, because the fact that the charges were

20   nolled, is consistent with the fact that the defendant

21   was being prosecuted here.  There's nothing to suggest

22   that the government and the law enforcement doesn't feel

23   there was a basis for the charges.

24           Second, the description of the victim, the

25   victim's story about what happened to her is supported in

1    part by images on her computer.

2            With respect to the other Virginia victims that

3    have been brought to the court's attention in connection

4    with Pepper, the court credits the statements of

5    Katherine, the Virginia victim's mother, one of the

6    victims, the photographic evidence reviewed by the court

7    as Exhibit 17 and 18 or 18 and 19.

8            MS. PATEL:  17 and 18.

9            THE COURT:  17 and 18 also corroborative of the

10   statement given by the victim's mother so the court does

11   find based upon a preponderance of the evidence in the

12   absence of no contradictory evidence other than the

13   general denial by the defendant that, in fact, he did

14   engage in sexual abuse of other victims including minor

15   victims as young as eight years old, in addition to the

16   minor victim in this case.  This, of course, does not

17   affect the guideline calculation I'm about to move to but

18   it is facts that are pertinent and relevant to the

19   sentencing in the case.  We need to move to the guideline

20   calculation as the Second Circuit repeatedly tells the

21   District Court Judges, there must be a guideline

22   calculation done.  I believe the defendant objects to two

23   of the enhancements.  Otherwise I don't believe there is

24   an objection.  That you object to the enhancement for

25   sadistic and masochistic conduct and supervisory control

1    or custody, paragraph 21 and 22.

2            MR. RICCIO II:  I believe that's correct.  Let

3    me double check.

4            THE COURT:  Let's go to those.  The first let's

5    go to the supervisory control or custody of the victim.

6    You indicated in one sentence in your brief that you

7    object to that.  On what basis do you object?

8            MR. RICCIO II:  At the time that I provided the

9    objection, I questioned whether or not the minor victim

10   at the time -- whether or not Mr. Oehne was together with

11   the minor victim a lot of the time or some of the time.

12   I since went back and looked.  There were points in time

13   where Mr. Oehne wasn't simply the only person who was

14   ever with the minor victim.

15           THE COURT:  I don't think anybody would dispute

16   that.  Clearly her mother was living in the apartment.

17   I'm sure the mother was there quite a bit of the time but

18   I also think.  I certainly have the impression, you tell

19   me if I'm wrong, that the record supports a finding that

20   there were times, many times over this period of what was

21   a very long period of time in which Mr. Oehne had custody

22   and control over the minor victim.  In other words, there

23   was no other adult and in fact, she had been left in his

24   custody presumably by her mother.

25           MR. RICCIO II:  Not all the time but there were

1    times due to the mother's unavailability for many various

2    and sundry reasons but I think that's a fair conclusion

3    to make.  There were certainly opportunities and times

4    where Mr. Oehne was alone with the minor victim and no

5    one else was there.  There were certainly many times the

6    mother was in the house at the same time maybe not

7    physically present in the same room.

8              THE COURT:  Right.  I don't understand this

9    enhancement to require over a two year period of time the

10   defendant was the only person who had custody or

11   supervisory control.  I think the idea is that from like

12   a baby-sitter comes on a Saturday night, this enhancement

13   would apply even though the person only babysits one

14   night in six months.  For that time period that

15   babysitter is in supervisory custody or control of the

16   victim in that hypothetical case.  I don't see how Mr.

17   Oehne isn't likewise.

18             MR. RICCIO II:  Using that theory and that

19   example, they would certainly apply.  What I should have

20   said in a more artful way than the memo is that if you

21   are looking for a quantum, if you are looking for a

22   number of times, the law doesn't require a number of

23   times.  If you are looking for a number of times, I don't

24   know if that would satisfy.  Be as it may, using the

25   babysitter argument, that would allow that enhancement to

1    apply.

2            THE COURT:  The application notes number 3A says

3    in general subsection B5 is intended to have "broad

4    application and includes offenses involving a minor

5    entrusted to the defendant whether temporary or

6    permanently."  For example, teachers, day care providers,

7    or other temporary caretakers are among those who would

8    be subject to this enhancement.  To decide this

9    enhancement, I should look to the actual relationship

10   that existed and not simply to the legal status.  I

11   guess, you tell me if I'm wrong, but my view of the

12   relationship is that Mr. Oehne was a live-in boyfriend of

13   her mother.  In that regard, he was in this apartment

14   where she lived and probably much of the time, the mother

15   was there with him and therefore, the mother was in

16   charge or custody of the child but then on other

17   occasions, the mother was not there or Mr. Oehne took the

18   child out of the home by himself and that in those

19   occasions, he had custody and control over this minor.

20   She's eight years old.  She's not out on her own.  If I

21   have thing wrong about my view of the record or the

22   facts, Attorney Riccio, please speak up.  I think if

23   that's in fact what happened, then that enhancement has

24   to apply.

25            MR. RICCIO II:  The way your Honor just recited

```
 1        the facts, that's correct.

 2               THE COURT:  All right.  I'm sorry.  I was

 3        mistaken.  I think you objected to three of the

 4        enhancements.  The next one I will take is the commission

 5        of a sexual act.  I have reviewed the exhibits 1 through

 6        15 unredacted and I think you have as well.  And taking

 7        the definition of sexual act.  In particular, the

 8        definition at 2246 subpart 2A, it seems to me

 9        indisputable the image that's contained in Exhibit 9 fits

10        that definition.  If you need to look at the images while

11        I'm speaking, if I misnumbered my notes, you can correct

12        me.  Exhibit 8 would clearly satisfy B, subpart B.  And

13        Exhibit 9 probably also satisfies subpart C.

14               MR. RICCIO II:  I have to say, your Honor.

15               THE COURT:  Exhibit 1.

16               MR. RICCIO II:  The images I had seen them

17        before and didn't know which ones the government would be

18        relying upon or the ones you would be seeing.  I have

19        seen them now and I think Exhibit 9 is pretty much right

20        on point.  I will say --

21               THE COURT:  Exhibit 8 fits the definition of

22        subpart B literally.

23               MR. RICCIO II:  I think so does nine.

24               THE COURT:  Nine does as well.  Do you still

25        object there was a sexual act?
```

1           MR. RICCIO II:  No.  I will say there was a

2    basis at the time when I objected because I saw the

3    images on a couple of occasions.  I tried to put them out

4    of my mind.  The term connotes in a general sense.  After

5    reviewing the statutory citation and looking at the

6    images again, I don't have a true basis to object to that

7    enhancement.

8           THE COURT:  Also 2246C3, which is sexual contact

9    which I think also satisfies this enhancement.  Am I

10   correct about that, Ray?  Can it be sexual act or sexual

11   contact as well?

12          THE PROBATION OFFICER:  I think act is also

13   included.

14          MS. PATEL:  If you look at D, the intentional

15   touching not through the clothing of the genitalia of

16   another person who is not 16.

17          THE COURT:  I'm looking at 2246 subpart C that's

18   the definition of sexual contact.  It strikes me that

19   image 7 satisfies that.  And that the guideline

20   enhancement 2G2.1B2A requires, quote, the commission of

21   the sexual act or sexual contact.  I think all of those

22   are satisfied.  The last one that's objected to is

23   sadistic and masochistic conduct enhancement which under

24   2G2.1B4.  The probation officer has recommended that

25   enhancement.  I gather the defendant objects to it.  I

1    would like to hear first from the defendant, then I will

2    hear from the government on that one.

3            MR. RICCIO II:  This is one of those terms, your

4    Honor.  It connotes something a lot different than the

5    law suggests that it is.  It is one of those enhancements

6    that according to statute article is something that you

7    see a percentage but almost applies in every case so

8    getting back to the empirical argument but the term

9    connotes one thing this is a footnote in Attorney Patel's

10   sentencing memorandum stating that this enhancement could

11   apply simply on the basis of image depicting sexual

12   contact with the prepubescent child.  Using that theory,

13   and that application, it sounds like it would apply

14   because referring to the same pictures that the court

15   referred to I think it would apply.

16           THE COURT:  I'm not sure I agree with her

17   characterization of what's required so maybe I will turn

18   to her.  My understanding, Attorney Patel, is that in

19   this circuit looks like pretty much any where that if I

20   find by a preponderance of the evidence, one, the image

21   depicts sexual activity involving a minor which I have

22   found that in a case of more than one victim and the

23   depicted activity would cause the minor pain, that's

24   sufficient to apply this enhancement, correct?

25           MS. PATEL:  Correct.

1              THE COURT:  That would be U.S. versus Freeman,

2      U.S. versus Otters, and then quoting that U. S. versus

3      Gilmore, which image or images would you rely upon for

4      the court to make a finding that the second and I guess I

5      should state my understanding.  This is an objective

6      test.  It is not a question of whether the images show

7      pain or don't show pain or they show smiles or don't show

8      smiles.  It is what an objectively a person would think

9      would cause pain to the minor that involves a minor if it

10     involves sexual activity.  If you think I'm mistaken, if

11     you are in agreement with me on that definition or that

12     standard or that test for this enhancement, I guess I

13     would ask you which of the images you would rely to

14     suggest that I could base a finding.

15             MS. PATEL:  I think to oversimplify it is

16     whether or not it would cause pain, what the cases seem

17     to be doing obviously the younger the child, the more

18     likely any kind of penetration could and would cause

19     pain.  To that end, the government while I recognize that

20     government nine may not seem like full penetration, it

21     appears that's where it is going.  That would certainly

22     cause her pain.  In addition, number 10, 11, and 12 he's

23     having her insert an object.  That would cause pain to,

24     you know, a nine-year-old child and even government

25     Exhibit 5, your Honor, I would argue is was directed by

1    Mr. Oehne and that seems like it would cause a

2    nine-year-old child pain.

3            THE COURT:  My estimation of when Exhibit 9

4    likely occurred bearing no date, the background of the

5    paragraph is consistent with 11 and 12.  Would you agree

6    in that respect and those bear a date two years after

7    these events began?

8            MS. PATEL:  That's correct.

9            THE COURT:  So the child is approximately 10 at

10   that point?

11           MS. PATEL:  Yup.  Government's Exhibit 5.

12           THE COURT:  One question.  Five is earlier.

13           MS. PATEL:  Four and five are 2004.  So she's

14   younger at that point and even 3 is in 2004.

15           THE COURT:  Yes.  Can I ask you what basis --

16   what supports the argument that 12 qualifies?  It is not.

17   The defendant is not in those images, that image,

18   correct?

19           MS. PATEL:  No.  I would argue that he's

20   instructing her to do that.

21           THE COURT:  I don't see anything in the case law

22   that addresses what the penetration is with.

23           MS. PATEL:  No.  I think it is simply.  I think

24   anything that could cause hurt or pain to a child is what

25   the case law is getting to.  It wouldn't have to be

1     sexual intercourse.

2               THE COURT:  All right.  Attorney Riccio, do you

3     want to respond at this point?  I'm focused particularly

4     on Exhibit 9 and Exhibit 12.

5               MR. RICCIO II:  I think cases like the Reardon

6     case.

7               THE COURT:  Not there aren't others in my

8     opinion.  Those are the most supportive of this

9     enhancement.

10              MR. RICCIO II:  One of the cases cited by the

11    government, the Reardon case, that seems to cast quite a

12    large blanket over these types of --

13              THE COURT:  The Reardon.

14              MR. RICCIO II:  U.S. versus Reardon.  So if

15    that's the applicable law, it is an objective standpoint.

16    It is what the case law says it is.  Subjectively we

17    won't go there.  That's not part of the test although

18    subjectively I don't know there could be a different

19    conclusion.  But objectively the Reardon case casts quite

20    a large cover over what could be considered pain and

21    consequently whether or not this four-level enhancement

22    would apply.  I think it is an enhancement that again

23    getting back to the Attorney Stabenow applies so often it

24    comes with every case arguably.

25              THE COURT:  Clearly in the 15 images I looked

1    at, there are a number of images that don't have it, that

2    if that's all we had by way of images, the defendant

3    would still be guilty of the same crimes.  In other

4    words, we can look at exhibits.  I don't know the

5    numbers.  There's certainly some there's no evidence of

6    any touching or penetration, it is posing so it would

7    haven't applied if that's all the government would have

8    put in front of me.  It may be it applies in every case.

9    That may be because the people who commit this crime want

10   that to happen.  That's part of that conduct.  Should it

11   be built into the base offense level then, I don't know.

12   But it certainly you could commit this crime without it.

13   In fact certain of the exhibits, if those were the only

14   ones, as I say, those would be the same crime, right?  If

15   I took Exhibit 1.  If that was the only image of this

16   case of this victim and Mr. Oehne uploaded it to the

17   Internet, he took it, wouldn't he be guilty of the same

18   crimes that he's charged with?

19           MR. RICCIO II:  Yes, minus --

20           THE COURT:  Minus this enhancement, right.

21   Thank you.

22           MR. RICCIO II:  Nothing further.

23           THE COURT:  Exhibit 12 in this court's view

24   clearly supports a finding of penetration.  In that

25   instance was a foreign object and it is I wouldn't say it

1    is fully inserted but it is certainly inserted into the

2    vaginal area.  The court has to conclude that would cause

3    pain to a 10-year-old girl.  In Exhibit 9 it is Mr. Oehne

4    who has penetration.  Admittedly it is not into what I

5    would say the vaginal area but it is certainly passed the

6    side of the vaginal opening and given the victim's age at

7    that time that in this court's conclusion, any

8    penetration be painful.  I note in the first image the

9    victim has a slight smile and in the second one, she's

10   not smiling.  I don't know how to characterize her

11   expression.  It is very difficult but I think it is very

12   clear, it is an objective test and that as the court said

13   in the circuit, in the Gilmore case at footnote six, we

14   seriously doubt whether any reasonable fact finder

15   applying objective standards could determine that the

16   penetration of an eight-year-old girl by an adult male

17   would not cause pain to the minor.  I don't know from

18   that case the degree of the penetration that was being

19   discussed by the court but it is this court's conclusion

20   that the degree of penetration depicted in Exhibit 9 by

21   itself and buttressed and even greater in Exhibit 12,

22   that that would objectively cause pain to what I'm

23   estimating at the time was a 10-year-old victim.  So the

24   court does apply that enhancement.

25            Therefore, the court determines the guidelines

1    as follows:  2G1.1A establishes a base offense level of

2    32 for a production of child pornography.  The court is

3    using this guideline because it results in a higher

4    guideline then if I applied the other offense of

5    conviction guideline.  The court applies a four-level

6    enhancement because the victim had clearly not attained

7    the age of 12 at the time the offense began, she was

8    approximately eight appears to continue until she was 10.

9            Further, the court adds a two-level enhancement

10   because there was a commission of a sexual act under

11   2G2.1B2A.  There were multiple commissions of the sexual

12   acts that are depicted and recorded in the photographs.

13           The court applies a two-level enhancement under

14   2G2.1B3 because the defendant distributed the photographs

15   he took of this victim and indeed has been attested to by

16   the victim's father over 3000 notices have been provided

17   to him that images of this minor victim have been found

18   on computers of others in possession of child

19   pornography.

20           Four levels are added under 2G2.1B4 because the

21   material; i.e., the photographs portray penetration which

22   qualifies as sadistic and masochistic conduct.  The court

23   specifically makes that factual finding as required under

24   Gilmore and the other cases.

25           Further, the court adds two levels under

1    2G2.1B5 because as I have already found, the minor victim

2    was under the custody and supervisory control of the

3    defendant clearly at the time of the abuse.

4         Does the government make a motion for the third

5    point of acceptance and recommends the two levels in

6    addition?

7         MS. PATEL:  We do, your Honor.

8         THE COURT:  The court grants the reduction for

9    acceptance of responsibility and reduces the offense

10   level by three resulting in the total offense level of

11   43.

12        The defendant's criminal history is limited to

13   one petty larceny that counts as one point and places him

14   in category one.  The offense level 43 and category one

15   results in a sentence of life.  However given the plea

16   agreement the defendant pled guilty to two counts which

17   together carry a maximum penalty of 50 years so the

18   guideline becomes 50 years or 600 months.  Is there any

19   further objection to the court's guideline finding?

20        MS. PATEL:  Nothing from the government.

21        MR. RICCIO II:  Nothing from the defense.

22        THE COURT:  Then I will hear from you, Attorney

23   Riccio, on whatever you wish to address on the issue of

24   sentencing here today.  Obviously I have a number of

25   other factors to consider that I haven't begun to address

1     and if the defendant wishes to be heard, obviously I

2     would ask you to let me know when you would like him to

3     do that.  If you wish his son to speak as well, I would

4     be pleased to hear from him as well.

5          MR. RICCIO II:  Many of my comments I will

6     confine to what the court already has in my sentencing

7     memorandum.  Purely it is an application of 3553(a).  As

8     far as his history and characteristics are concerned, I

9     think Mr. Lopez did a fine job of summarizing that period

10    of Mr. Oehne's life as far as from birth until his adult

11    life.  We do have an individual who at the age of eight

12    suffered abuse himself at least on one occasion.  I know

13    we talked about and on some level criticized Dr.

14    Krueger's report.  What Dr. Krueger did do was apply 19

15    different tests that are used in a psychosexual

16    evaluation and the court has its conclusion.  I would ask

17    the court to keep that in mind as well.

18          His life is when I say unremarkable, I mean that

19    in a good way.  He has a relatively good work history.

20    He has what is by all accounts a decent family

21    upbringing.  His son is an incredibly intelligent young

22    man.  He's here and drove up from the south and will be

23    addressing the court in a moment.

24          As far as the kind of sentences that are

25    available, there aren't that many causes to go to.

1    Because this is such a rare case that this court really I

2    don't think has ever seen and this circuit doesn't see

3    very much of.  There are cases.  Many of them deal with

4    possession only like Dorvee and Grober.  There are other

5    cases.  The Ivory case that's an Eleventh Circuit case.

6    It wasn't this particular offense. Ivory was a gentleman

7    who was arrested for sexual exploitation of children

8    involving 45 different children.  That was in Florida.

9    He went to Cambodia or somewhere and Judge Edmondson had

10   initially sentenced that defendant to 17 and a half

11   years.  The Eleventh Circuit affirmed the decision but

12   enbanc reversed it because they thought that was not a

13   reasonable sentence.  The Eleventh Circuit enbanc ordered

14   that it return to the district court with direction he be

15   sentenced to 30 years which was the statutory maximum for

16   that singular offense that he was charged.  I know that's

17   not this case and this charge but what I'm suggesting he

18   hasn't been sentenced yet.  There's further appeals but

19   in that case where Mr. Ivory did arguably a lot worst

20   conduct.  He'll basically be getting 30 years.  The court

21   or someone else decides he should get the statutory

22   maximum.  Other than cases like that, there's really not

23   much to go to.  Mr. Oehne is 50 years old and a sentence

24   of this statutory minimum of 15 or even if the court were

25   to run both minimums consecutively to 20, would mean he

1    gets out of jail at the earliest at age 65 or 70, and the

2    court is aware in a general sense as a general rule

3    recidivism goes down with age.

4         THE COURT:  Is that with pedophiles?

5         MR. RICCIO II:  I think going back to the

6    Stabenow or you will see it in bits and pieces in the

7    cases I cited, and the court cited, there's some

8    suggestion.  There's no official said yes or no.  But

9    what we do know is while he's incarcerated, there's a lot

10   of special treatment that exists within the BOP.  I'm

11   sure this court at that time of sentencing Mr. Oehne will

12   be imposing a very long period of supervised release, if

13   not a lifetime period of supervised release.  As far as

14   the special conditions of supervised release, there are

15   specific conditions relative to sexual offenders.  So

16   between the resources of the Bureau of Prisons which are

17   numerous in certain places and what occurs during the

18   period of supervised release, I think the recidivism will

19   go down as well.

20        THE COURT:  I don't know that I can assume that,

21   sir.  I don't know that.  I'm not sure.  I don't know if

22   the government is going to be able to help with me with

23   any studies or evidence to the contrary.  The worst kind

24   of evidence is episodic but I don't know that there is

25   evidence that the same evidence that would tell me that

1    category one defendants, older defendants aren't going to

2    recidivate applies to the pedophiles.  As helpful to you

3    as Dr. Krueger's report is which I will have to address

4    that in a moment, it does identify the defendant as a

5    pedophile.  I don't know in the nine months of testimony

6    Attorney Patel is going to tell me that Congress heard

7    something though this subject.  I don't know that I can

8    assume that his Criminal History One is a predictor of

9    the low recidivism rate because that statute is based on

10   all crimes that are primarily category one or what I will

11   call white collar crime.  I don't think I would

12   characterize this as white collar.

13           MR. RICCIO II:  It is not.  But what the court

14   knows in the general sense or specific sense that there

15   is facilities where sex offender care and treatment

16   exists exclusively.  We don't know that if there is

17   treatment that means there's no recidivism.

18           THE COURT:  I know that isn't true.  That's not

19   100 percent true.  I don't mean to rely on episodic

20   evidence.  It could be testified to the fact it was not

21   100 percent effective.

22           MR. RICCIO II:  It applies in every case we both

23   know.

24           THE COURT:  Sure.  The problem is that the

25   victim in these kind of crimes.  I think that may be the

1    hysteria you are speaking of Congress's reaction is we

2    can't afford to have another victim.  I think the fear is

3    we can't afford to make a mistake about whether somebody

4    is going to be rehabilitated or not.  I don't know.

5              MR. RICCIO II:  As stated in a general sense, we

6    don't know now at this point.  We may never now.

7              THE COURT:  It maybe that 30 years from now

8    we'll look back and say how very wrong we were about

9    people that committing these crimes.  The way the world

10   goes that may very likely be the case.  I can only

11   sentence Mr. Oehne based upon what I know today.

12             MR. RICCIO II:  I think based upon that.  Based

13   upon the little we know about cases like this but looking

14   upon cases similar to this, the maximum is not the

15   answer.  I don't know if the minimum is the answer.  I

16   know that what Dr. Krueger's report said as well as what

17   his son says and Mr. Oehne is about to say suggests that

18   a sentence closer to the minimum would be sufficient but

19   not greater than necessary.

20             THE COURT:  How do I know that?

21             MR. RICCIO II:  You will never know that.  None

22   of us will ever know that.

23             THE COURT:  Right.  What is the basis for your

24   stating that?

25             MR. RICCIO II:  Well, for example, if you were

1    to look at a similar but not exactly on point by.  Case.

2    You can only look upon what other cases may have done.

3    In the Ivory case which is not a pornography case, the

4    court initially said 17 and a half.  I know that's been

5    over turned.  Even if they were to sentence Mr. Ivory to

6    30 years, is that the bench mark the court could use?

7    Maybe yes or not.

8            THE COURT:  I'm about to ask the government

9    counsel why they urge me to impose a 50-year sentence

10   when I imposed only a 25-year sentence on someone who had

11   multiple minor victims, who physically, mentally abused

12   them and subjected them to sexual abuse by others for

13   money.  I think I know what her answer is going to be but

14   different cases make different results.  So I have no

15   idea why they pled a guy like Ivory to 30 year maximum.

16   Maybe it was they didn't want the 45 minor victims to

17   testify to make the case and that was the only way to

18   make the case.  I don't know.

19           MR. RICCIO II:  I can't sit here and compare Mr.

20   Oehne.  I imagine you are referring to Mr. Davis.

21           THE COURT:  I am.

22           MR. RICCIO II:  There's differences.  I think

23   Mr. Davis' conduct in certain respects is a lot more vial

24   but there's certainly other cases -- I think it is

25   pending in front of your Honor -- where Mr. Sensay's

1    conduct is lot more vial but again I can't -- we're in a

2    very small world, very small selection.

3         THE COURT:  We are.  The difference I think is

4    the publishing to the Internet and the permanency of

5    that, the repeated violation of the victim by that.

6    That's a difference.  I think to be perfectly honest with

7    you what happened in Virginia is not a difference but is

8    impactful I think in my thinking.  You, advocating for

9    your client well, want me to look at this case.  Yes,

10   there's one victim and that's horrible but otherwise this

11   man is a good man and had a good life.  He understands

12   his mistake and he won't do it again.  That's one

13   picture.  But when I see the images I saw in Exhibit 17

14   and 18 came from what I believe to be his camera.  I

15   sustained that search.  You know, I'm not going to accept

16   the idea that his girlfriend took those pictures when I

17   have another victim who told me he stood at the door of

18   the apartment and he came to the door and her daughter

19   was in the apartment.  I will conclude clearly by a

20   preponderance that that happened and, you know, the idea

21   that you would entice eight-year-old girls to your

22   apartment is quite contrary to the picture that you would

23   have me have and Mr. Oehne would have me have of him of a

24   person who inadvertently uploaded images that have been

25   hit on in 3000 plus investigations.  That's a different

1    picture, Attorney Riccio.

2              MR. RICCIO II:  In order to present the

3    different view, I think that at this time Mr. Oehne's son

4    Christopher who is present in the courtroom would like to

5    speak.

6              THE COURT:  Absolutely.  I would be pleased to

7    hear from him.  He would like to come forward.  Good

8    afternoon, Mr. Oehne.  I appreciate you having traveled

9    to be here to support your father.

10             THE WITNESS:  Thank you.  I would like to

11   introduce myself.  My name is Christopher Oehne.  I'm the

12   son of William Oehne.  Due to the nature of these charges

13   and the circumstances to say it's difficult for me to be

14   here would be an understatement.  And to the court and to

15   the families and the victims, I'm not here to make light

16   of the situation or try to justify anything.  I'm here to

17   tell you a little bit about my father and, you know, as

18   he raised me as his son.  I attribute much of my success

19   in my career, in life in general to him to his

20   upbringing.  Always showed me the right way to do things.

21   Worked very hard to provide for me and my mother and was

22   always there for me if I needed something.  To say, you

23   know, this came out of left field.  This was a very big

24   shock.  Again for me to be here is probably the hardest

25   thing I ever hard to do but I'm here because I love my

 1     father very much.  Like I said, he's always been there

 2     for me.  He was a groomsman in my wedding.  He's been for

 3     me through thick and thin.  The only thing I can do is be

 4     here for him.  It hurts me to think of having a child,

 5     you know, my father not being there and in my child's

 6     life.  My relationship with my father in the last two

 7     years since he's been incarcerated as dwindled to the

 8     extent of phone calls and letters.  This is the second

 9     time I have seen him in two years.  So it's been very

10     hard or me.  Sentencing I would like you to consider my

11     family as well and myself so thank you for your time,

12     your Honor.

13            THE COURT:  I appreciate your remarks very much,

14     Mr. Oehne.  Thank you again for being here.

15            MR. RICCIO II:  There was some additional

16     letters that I attached.  Many of Mr. Oehne's family as

17     you can see by evidence of his son traveling up.

18            THE COURT:  These are attached to your

19     memorandum.

20            MR. RICCIO II:  Yes.

21            THE COURT:  I read all of those.  Those are the

22     ones I'm asking you to look at.  I don't think people's

23     addresses should be on there.

24            MR. RICCIO II:  I will take care of that, your

25     Honor.  What that shows inadvertently they are all from

1    Virginia, Carolina, his mother who supports him is ill

2    and can't travel.  There are others that state their kind

3    words.  That's attached to the memorandum.  At this point

4    I have nothing further regarding 3553(a) factors I think

5    my memo touches on those factors.  The court has to

6    consider specific and general deterrence.  I think I

7    touched on that.  The court is aware of the legal

8    arguments I have with respect to the penalties.

9         At this time, your Honor, Mr. William Oehne

10   would like to make a statement to the court.  Would the

11   court like him to step up to the podium?

12        THE COURT:  He can address me from there is

13   fine.

14        THE DEFENDANT:  I'll attempt to read this.  I'm

15   very nervous so.

16        THE COURT:  Reading it is fine, Mr. Oehne.  I

17   understand that it is not easy.

18        THE DEFENDANT:  Your Honor, there are no words

19   that can adequately express my apologies to the victim

20   and her family; however, I will make a big attempt.  In A

21   period of moral and judgmental weakness through my

22   actions, I destroyed her family and now also my own.  To

23   both families please accept my most humble apologies from

24   the bottom of my heart and the depths of my soul.

25   Unfortunately there's nothing I can say that will lessen

1    the severity of what I have done.  Nothing I can do but

2    accept my punishment rightly so because I deserve to be

3    punished.  But if you will permit me to ask you, your

4    Honor, is to temper justice with mercy.  I'm sure you

5    have seen many defendants before you confessing their

6    sorrow and remorse but I can assure your Honor I'm being

7    sincere.  Mere words cannot convey the feeling of regret

8    I feel not because I'm now incarcerated but because I

9    have changed lives of others for the worst.  And they

10   will never be the same.  Indeed the worst part of what

11   will become of me is not my fate but the fate of my

12   family.  They will be left alone while I have gone and

13   that's one of the things that hurts because I'm solely to

14   blame for my absence.  Excuse me.  I know, your Honor, I

15   did not consider them or the victim and her family when I

16   did what I did and there's no excuse for that.  All I can

17   do is offer my heartfelt apologies and pray for the

18   victim and her family that some day their lives will

19   return to normal.  It is through my actions this happened

20   and I assume full responsibility.  I also pray for

21   forgiveness but I do not expect it because what I did was

22   unforgivable.  My actions affected many people.  There

23   are the taxpayers whose money was used to investigating

24   and prosecuting me to the judicial branches of the

25   government whose valuable time was spent in bringing me

1    to justice.  To them I extend my sincere apologies.  In

2    closing, I want to say that my remorse will never go

3    away.  It will only deepen.  Before you I stand sinful

4    and sorrowful.  Please, your Honor, I ask for your mercy.

5    Thank you.

6            THE COURT:  Thank you, Mr. Oehne.

7            MR. RICCIO II:  Your Honor, finally paragraph 77

8    of Mr. Lopez's report, Mr. Lopez quotes a couple of

9    things that Mr. Oehne said during the Presentence Report

10   and it moves me when I heard them he quoted one line of

11   scripture which moved me.  He also stated that the person

12   who did these things died a long time ago.  I have known

13   Mr. Oehne for a year and a half.  I believe his remorse

14   is true and it will be ongoing.  Other than those

15   statements, your Honor, and what Mr. Oehne's son stated,

16   I have nothing further.

17           THE COURT:  Thank you, sir.

18           Attorney Patel, before you begin so I don't

19   interrupt you with this.  I believe the Presentence

20   Report reports that no requests for restitution have been

21   made.  May I assume that the government has advised the

22   victim of their right to seek restitution as well as to I

23   think commence a civil action pursuant to 2252AF and they

24   have been apprised of all of that?

25           MS. PATEL:  Yes.

1          THE COURT:   If they wish restitution for this

2     court to I assist they need to act within 90 days of

3     today otherwise I use the power to effectuate that.   They

4     can proceed another way.   They lose the power of an order

5     of restitution.   You have advised them of all of that?

6          MS. PATEL:   Yes.

7          THE COURT:   Do you know if they have an

8     intention seeking restitution.

9          MS. PATEL:   Given the restitution laws and

10    particularly we look for things like medical documents,

11    counseling that sort of things, we have certainly advised

12    them.   We talked to them.   We urged them to consider

13    getting separate counsel who can make a restitution

14    request because the victim remains a minor.   She's 15

15    years old right now.   That the parents would have to do

16    it on her behalf.   We'll remind them today.   I noted if

17    they come up with anything, they have 90 days of the

18    court's judgment.

19          THE COURT:   All right.

20          MS. PATEL:   Your Honor, we certainly recognize

21    in Mr. Oehne's son speaking that the tragedy at

22    sentencings is always the innocent people who are made to

23    suffer when the defendant is being sentenced.   That said,

24    Mr. Oehne did not engage in a moment of weakness.   He

25    lived in the house from 2003 until 2007.   There was only

1    a period of time in 2005 where he broke up with the

2    mother.  In her interview, the minor victim reported that

3    the abuse started a few months after he had moved in.

4    The photographs themselves reflect abuse from the 2004

5    and again in 2006.  And what they show is repeated and

6    long term abuse.

7          When we talk about the sentencing enhancements

8    and what a court should punish, it is so striking what

9    the enhancements don't take into account is each and

10    every separate act of abuse.  That's what the court

11    should punish.  The court should be punishing the sexual

12    abuse each and every time it occurred, not in one lump

13    sum.  He did it to her so repeatedly and every single

14    time, he caused indelible physical, emotional and

15    psychological harm to this girl.  It wasn't enough he did

16    the actual acts.  We know in 2004, 2006, he created a

17    permanent record of that harm by photographing them.  He

18    did it because this is a man who stands before at the age

19    of 50 who has a very clear sexual interest in children.

20    This is how he sexually gratifies himself.  He's a

21    pedophile.  It is not a question.  He enjoys children.

22    That's his form of sexual gratification.  He himself

23    admitted he would masturbate to these images.  He creates

24    I thinks for his own sexual gratification and pleasure

25    and does it at the cost of this child.  He then

1    indiscriminately sends them out in the world.  When he

2    does that, it is the 3000 or so until March of 2010, the

3    father began receiving notifications in the case from

4    April of 2009 until February of this year.  There's

5    another number on top of that.  So each and every one of

6    those offenders who have been caught presumably were

7    themselves receiving pleasure from these images.  Each

8    and every single time she was revictimized by someone

9    else looking at those images and engaging in the pleasure

10   they did from them.  The enhancements don't take that

11   into account.  They don't take into account how much this

12   child has been made to be abused, how much she will

13   suffer for the rest of her life.  It is incalculable harm

14   that your Honor is going to have to sentence on today.

15   It is a permanent and incalculable indelible harm to a

16   child that's occurred.  What he know about this man is

17   that he's a repeat contact offender.  This is not a man

18   who stands before you to say he gets sexual gratification

19   in looking at the photos.  He has a disease.  He

20   shouldn't be looking at photos.  He's made such a

21   significant contribution to the world of child

22   pornography.  He's in every way contributed and he has

23   destroyed so many lives in the process.

24          When we talk about the cases, I always find it

25   amazing we talk about the other cases from the other

1   circuits.  We look a statistics from the Sentencing

2   Commission.  On one hand defense counsel says look at the

3   unique facts of this case.  On the other hand, we talk

4   about empirical data and statistics.  This is case is

5   atypical.  There's no other case like it.

6          We're asking your Honor to sentence on these

7   facts.  The Ivory case there may have been one count.

8   That's a 30 year maximum.  That's all the Eleventh

9   circuit could do.  I don't think it is a worthwhile

10  exercise to talk about this case or that case.  The

11  worthwhile exercise now is talk about this case.  He's

12  committed very separate and distinct crimes.  He should

13  be punished that each caused so much harm.  The court

14  should recognize that the man before you is a repeat

15  sexual offender.  He's a hands-on contact offender.  We

16  can theorize and talk as a society about recidivism.

17         We provided your Honor with the Cunningham

18  decision out of the Northern District of Ohio.  On page

19  19, is statistic after statistic after statistic

20  regarding the high rate of recidivism when it comes to

21  these type on offenses.  The Buttner study is another

22  study that was done.

23         THE COURT:  What.

24         MS. PATEL:  The Cunningham opinion.  19.  The

25  judge in that case talks about several studies that talk

1    about the very high rates of recidivism.  As a society

2    what we don't know, we don't know what causes this and we

3    don't know how to stop it.  So what you do know the man

4    in front of you will act.  He's acted often and unlike

5    the Davis case, the children before him are 7, 8, 9 years

6    old.  If you talk about any group of people who look for

7    the attention from adults around them, who rely on their

8    very survival of adults, for their existence.  This is

9    that group of children.  When you talk about 7, 8, 9

10   years old, they are helpless, vulnerable children what

11   he's able to do is engage in this lengthy grooming

12   process.  Breaks down their defenses, breaks their

13   natural defense mechanisms, their inhibitions, and this

14   is the group he's targeting.  In the process what he's

15   very effective at doing is silencing them.  He uses the

16   techniques of buying them things and luring them for both

17   of the Virginia victim as well as the victims in this

18   case.  He told them they would get in trouble.  The

19   victim in this case she was told that the police would

20   take her mother away.  She would get in trouble and her

21   mother would be taken away.  Premeditated, complicated

22   acts of grooming that he was engaging in.  He's not just

23   a man of opportunity.  He's going to find a way to

24   perpetrate children and whatever we do, the facts in this

25   case support that justice, not vengeance, that justice,

1    in this case requires that there be retribution in the

2    powerful and substantial way.  This crime is so heinous.

3             THE COURT:  The defendant is 50 years old.  What

4    is the point of a 50-year sentence?

5             MS. PATEL:  To send a message very clearly are

6    we asking for 50, no.  We're not asking too far away.

7             THE COURT:  I was going to ask that you.

8             MS. PATEL:  We said approximately.

9             THE COURT:  Close to, close to the guideline

10   range.

11            MS. PATEL:  He deserves the benefit for pleading

12   guilty.  He didn't walk in and plead guilty earlier on.

13            THE COURT:  He didn't put you to trial.

14            MS. PATEL:  He didn't put us to trial.  He put

15   us through starting to prepare this victim.

16            THE COURT:  He didn't put the victim on the

17   stand.

18            MS. PATEL:  The benefit for any defendant

19   especially for any of my cases, deserves is not putting

20   the victim on trial.  I really do understand what's going

21   into that.  It is so frightening for that victim to take

22   that stand that I agree with you there's a benefit he

23   deserves for that.  For that does he deserve a 50 percent

24   break?  No.  What he has done, doesn't deserve a

25   50 percent break for coming in at the last minute and

1    pleading guilty when the government's forensic evidence

2    was so clear that he understood the consequences of what

3    was going to happen if the story was fully told and I am

4    reminded by my co-counsel, he put the government to its

5    test at the suppression hearing.  He didn't walk in the

6    door, I'm guilty, I shouldn't have done it.  I have a

7    disease.  I need help.  This is what I have done to all

8    of these children.  That's not the man before you.  The

9    man before you absolutely denied.  If I do know one thing

10   about sex offenders, that's the only trait they appear to

11   have in common is deny.  They minimize, then you continue

12   to minimize even after being confronted.  He's shown some

13   level of remorse today.  It is the most remorse I have

14   certainly seen throughout this case from Mr. Oehne but in

15   making your decision today, what I would ask the court to

16   do is it recognize that this is a case like no other.

17   That the victims in the case are young.  He's very

18   dangerous.  He's a repeat contact offender.  We have no

19   reason to believe if he comes out at 70 or 80, that he

20   will not offend against children.  We have the FBI

21   sitting here.  We have had oxygenarian cases.  There's

22   nothing telling me that an 80-year-old is not going to do

23   it.  Is it less likely, yes.  Usually we understand that

24   physical illnesses and the like might make it less

25   likely.  While he may stand before this court seeking

1    mercy, the United States stands before you and asking you

2    to you impose a fair and just sentence in this case.

3    That's one as I indicated that would require substantial

4    retribution.  I would like to thank the Probation Officer

5    for doing such a thorough report in this case.

6         THE COURT:  Anything further?

7         MR. RICCIO II:  Other than to say, your Honor,

8    while Ms. Patel says she holds it against the defendant

9    for repeated denial, I think his entering a plea and not

10   putting the government to trial.  The victim didn't have

11   to testify, so I think that's as Ms. Patel acknowledges

12   to his benefit.

13        THE COURT:  That's troubled me from the

14   beginning of this sentencing phase is that the sentence

15   that I could impose today is no different than what I

16   could have imposed in terms of guidelines after a trial.

17   And on the other hand what troubles me is that Mr. Oehne

18   in his interview with Dr. Krueger as late as February of

19   this year is still talking about Limewire and how that

20   somehow got up there on the Internet.  That's not

21   truthful.  I gave him acceptance.  I'm not meaning to

22   take it away by my remarks but that's -- I think more

23   than anything, it evidences what Attorney Patel is

24   talking about in terms of types of people who commit

25   these types of crime and denial.  It is not really my

1    fault.

2              I am going to take a brief recess we have been

3    out now for over two hours.  I would like to give Terri

4    and myself a ten-minute break.  I do expect -- I don't

5    know what the marshals want to do.  I expect I will be

6    back out in 10 minutes.  We'll stand in recess.

7              (Whereupon, a recess was taken from 04:15 p.m.

8    to 04:31 p.m.)

9              THE COURT:  It's the responsibility of the court

10   today to impose sentence upon Mr. Oehne following his

11   admission of guilty to the two counts of the conviction.

12             Before I do that, I need to reflect upon and

13   articulate on the record my considerations of all of the

14   factors that have been identified by Congress as

15   important in arriving at a fair and just sentence.

16             Before I do get to those factors, it struck me

17   as I left the bench that I may not have been sufficiently

18   clear in a finding that I made so I want to make it

19   clear.

20             With respect to the finding of the four-level

21   enhancement in connection with the finding a penetration,

22   I relied upon two different pictures.  In one of the

23   pictures there's no evidence of the defendant but it is

24   clear I think and undisputed the picture was taken by the

25   defendant and it is this Court's finding that the

1    defendant manipulated and controlled the minor victim

2    here, who at that time was no more than 10 and had been

3    subjected to manipulation and exploitation by the

4    defendant for several years.  That is the conduct she was

5    engaging in the picture I referred to I think it was 12,

6    I could be mistaken.  Two pictures I relied on.  One was

7    nine and one was 12.  In the one in which that the

8    defendant is not physically evident that he controlled

9    and directed the conduct of the minor victim that

10   constituted the penetration that met the guideline but in

11   addition, I made the alternative that with respect to

12   Exhibit 9.

13        Mr. Oehne, the Court has to consider, as I say,

14   a number of factors before I decide upon my sentence here

15   today.  We have already spoken about the sentencing

16   guideline which in Congress's view that guideline range

17   is a fair sentence and in this case, that range calls for

18   life imprisonment.  Because of your plea agreement with

19   the government, the maximum sentence I can impose and

20   thus the guidelines become 50 years which I think in your

21   case is likely life.  But nonetheless that's the

22   guideline and the Court will be mindful of that

23   guideline.

24        While I made some comments during my questioning

25   of counsel about some recent cases that are very critical

1    of the guidelines in child pornography cases, the Court

2    must continually remind itself that the defendant stands

3    guilty and convicted of two crimes in this case.  One is

4    child pornography distribution of what became an enormous

5    scale and the other is actually sexual assault upon a

6    minor victim repeatedly and over a long period of time.

7    Those cases which criticize the guidelines of child

8    pornography don't speak to the second crime the defendant

9    is convicted of here.  The facts of all of these cases

10   that I mentioned, address really mere possession or in

11   some cases, some distribution but not production

12   certainly and certainly not sexual assault upon the

13   victim.  And so while I really take no position on what

14   my view would be if I were faced with the facts that are

15   set forth in those cases, it is this court's conclusion

16   that the facts in those cases are quite different than

17   the facts in this case.

18         Mr. Oehne, the other factors I have to consider

19   are the need for the sentence, the need to avoid

20   unwarranted sentencing disparity among defendants with

21   similar records and similar conduct.  The nature and

22   circumstance of the two offenses present and your history

23   and characteristics.

24         With respect to the avoidance of unwarranted

25   sentencing disparities, I have to say that's a very real

challenge for the court.  I think there are no more than
a handful of cases that are like your case in the
country.  I didn't really find any reported cases that
speak to facts like yours.  Certainly the guidelines are
meant to avoid unwarranted sentencing disparities.  While
I say they are subject to criticism on the possession of
pornography, I don't believe those cases address the
production of pornography which in your case involves
actual sexual abuse.  Not just.  I put just in quotes.
It is abuse of minors by the viewing of pornography
images.  So while I understand that's a factor Congress
tells me to consider, I have to confess in all honesty I
don't know how to avoid unwarranted sentencing
disparities because I don't know of people with similar
records and similar conduct to you.  Obviously your
counsel has asked me to look at some other cases like the
Ivory decision and others one.  The Davis case that was
in front of me which the sentences were in the 25 to 30
year range.  But again I don't know enough about the
Ivory case.  I do know the Davis case but the facts are
very different so it is difficult to say they are similar
conduct so I should be looking at similar sentences and
comparing to it yours.

        The need for the sentence as articulated by
Congress, Mr. Oehne, is why do we as a society punish

1    people.  Some societies punish people just because they

2    want to.  It is almost like a cruelty unto itself.

3            In our society, we like the think there's a

4    purpose for the punishment, that the sentence needs to

5    reflect the seriousness of the offense in order to

6    promote respect for the lawyer.  It needs to provide

7    deterrence to your future criminal conduct or someone

8    else's who thinks about engaging in this type of conduct.

9    It needs to provide you with care and treatment in the

10   most effective way.

11           Although with the respect to the period of

12   incarceration, I believe in the guidelines I will not

13   remember the section, there's congressional.  Congress

14   has spoken to the fact that a period of incarceration is

15   meant to punish and not meant to be purposefully serving

16   the needs of care or treatment.

17           With respect to the seriousness of your offense,

18   I always stop here in every sentencing and make a comment

19   about how it is very hard almost metaphysically to speak

20   about one crime versus another in terms of its

21   seriousness.  You know, I talk about people who evade

22   taxes.  I say that's a serious crime.  It undermines our

23   government and people's respect for paying their own

24   taxes and our voluntary system.  I talk about drug

25   distribution and I will say that's serious because it's

1    destroys our neighborhoods and people's lives.  And I

2    have sentenced people for murder and I have talked about

3    how serious that is and how I characterize that as

4    perhaps the most serious offense we have in our nation.

5    I never had espionage or treason.  I think murder is

6    among the most serious offense.  And I thought a lot

7    about your offense and the seriousness of it and how that

8    seriousness has to be reflected in the sentence and I

9    have spoken a little bit this afternoon about my view of

10   the seriousness of this offense.

11          As a society, we have an obligation to people

12   who are helpless who can't care for themselves and that's

13   children.  And we as a society, have an obligation to

14   protect our children and when someone undertakes a

15   vicious assault upon a child and does it not once in a

16   moment of weakness but does it over and over again, then

17   proceeds to record it and then share the recording of it,

18   with I'm going to assume hundreds of thousands of people,

19   maybe millions.  The fact that 3000 plus are under

20   criminal investigation is probably the tip of the

21   iceberg.  In my view, that has to rank among the most

22   serious crimes we have.  I wouldn't want to diminish this

23   crime if it were a 12 or 14 year old.  I wouldn't want to

24   diminish the seriousness of it if you did it once.  I

25   wouldn't want to diminish the seriousness of it if you

1    took no pictures of it.  It would still be a serious

2    crime but you did all of those things.

3          The sentence also has to provide deterrence.

4    And related to that is the protection of the public from

5    further crimes.  When we're in the range of penalties

6    that we're talking about here this afternoon, the

7    parsimony clause as to the sentence that's no longer than

8    necessary to serve the needs of sentencing but I think

9    and I will get to this in connection with your history

10   and characteristics, but the conduct that occurred in

11   Virginia following what you did in this offense of

12   conviction here in Connecticut, raises serious questions

13   in my mind about what can be done to deter you until you

14   would be unlikely or not likely at all to do this again.

15         As I said to Attorney Riccio, the nature of this

16   crime is so horrific that I'm not sure there's much more

17   margin of error in our society if we talk about only 10

18   percent recidivate.  I don't think that's the number

19   myself.  The number suggested in that Cunningham

20   Memorandum of Opinion by Judge Adams which suggest far,

21   far higher numbers of likely recidivism for sexual

22   offenders.  Even if it is lower than what's suggested in

23   those studies, it is in some respect too high to tolerate

24   because the impact upon the victim.  Also as I say the

25   Virginia experience causes me to be terribly concerned

1  over the protection of the public by further crimes by

2  you.

3  Obviously the court will provide treatment for

4  you as that is one of the needs for the sentence to

5  serve.  I have spoken a bit about the nature and

6  circumstances of your crime.  I have to be very clear

7  that in this respect, unlike most cases where I sentence

8  the defendant who has pled, we're speaking about two

9  separate crimes here.  We're speaking about the

10  distribution of child pornography and we're speaking

11  about the manufacture and the making of the child

12  pornography through a sexual assault upon an

13  eight-year-old girl.  You obviously came to know this

14  child and she was very young sevenish and you began

15  clearly to groom her and indeed the few pictures I have

16  seen what are represented to be many, many pictures, 15

17  that I saw in terms of the temporal relationship and the

18  date, it is clear that you escalated in your sexual

19  contacts and actions with her.  You groomed her

20  perfectly, you bribed her perfectly, and she became, in

21  effect, your object to do what you wanted to satisfy

22  yourself and then to tout that to the world.

23  You continued in the conduct for approximately

24  two years, the girl is approximately eight to 10 years

25  old.  You were so successful that a state agency

1    suspecting there's abuse in the home, this girl denies it

2    when we know her denial is a false denial.  This wasn't a

3    moment of weakness for you, sir.  This was repeated and

4    constant.  We have images or I have seen images that only

5    cover two periods, however, in two different years.  You

6    took advantage of this young girl on many, many

7    occasions.  And that's just one of the crimes.

8            The other crime was sharing that with the world.

9    And there's no way to take that one back.  There's no way

10   to take the first one back either.  The court in the

11   Ferber decision noted that's a lifelong constant

12   revictimization of this child.  As I said, while 3000

13   plus recipients of these images are under law enforcement

14   investigation, that doesn't begin to address how many

15   people have actually viewed it nor does it tell us how

16   many times these images were used to groom future

17   victims.  I will not go into the details that are

18   recounted in the report in the government's memo about

19   this impact on this victim.  I don't know that it bears

20   any statement by me.  Anything I said wouldn't begin I

21   think to capture the impact upon this victim.

22           I also need to consider your history and

23   characteristics.  And as serious as the offenses are that

24   you have committed, that's not everything of who or what

25   you are, Mr. Oehne.  I'm sure that the victim and her

1  parents and the folks from Virginia who have been victims

2  of you, might disagree with me but it's my belief that no

3  defendant is ever just what the crime is they committed.

4  I think that's as bad as your crimes are, sir.  That's

5  true of you.  You obviously were a good father.  You

6  raised a very impressive young man as your son.  You

7  should be very proud of him.

8            THE DEFENDANT:  Yes.

9            THE COURT:  You know and I think Attorney Patel

10  is right is that in most cases, the impact falls most

11  hard upon the family of the defendant.  It is not their

12  fault what happened here.  It is your fault, Mr. Oehne,

13  but they are going to suffer.  They are suffering.  Of

14  course, it is a lot different than the victims and her

15  family.  Nonetheless, it is a pain you inflicted on your

16  own family as well but it bears observing that you

17  yourself grew up, you had a bad experience as a youngster

18  in terms of your own family upbringing in a good family.

19  You grew up practicing your religion.  You married and

20  appear to have been a good father and a good husband.

21  Eventually you were divorced from your wife.  She still

22  writes positively about you.  The problem is the other

23  history and characteristics.  It is very troubling to me,

24  very troubling to me your denials.  I understand.  There

25  are very few defendants, very few who when the FBI knocks

1    on their door effectively said I did it, everything you

2    think I did and I will tell you about it.  I understand

3    that's not the human nature but you have in a number of

4    circumstances and not that long ago even as late as

5    February of this year to Dr. Krueger, attempted in my

6    view to downgrade or suggest lack of responsibility for

7    what you have done in terms of the uploading the pictures

8    to the Internet, about the victim's attitude toward what

9    you were doing to her, the victim's role in what

10   happened, she was seven years old, Mr. Oehne.  If you

11   truly think that she enticed you in some way or she liked

12   it, that's extremely troubling.  That's what you have

13   said, Mr. Oehne.  The idea you would take these pictures

14   and touch the victim in the ways you touched her or cause

15   her to do things and pose in certain ways the excuse you

16   thought she might be a model.  What kind of model did you

17   think she would be?  The fact that you would take her to

18   the nude beach, become friendly with another man and end

19   up sitting out in front of the hotel with the man with

20   the idea you would go into that hotel with her at age

21   eight or ten, that's very disturbing.

22           What happened in Virginia after you left here

23   having committed the crimes you committed here, you

24   admitted in your statement to the government that you

25   sexually touched one of those victims on her breasts.

1     You clearly took pictures that are pornographic of two of

2     them.  The fact you didn't upload those pictures I

3     suppose is concellation to the victims in Virginia but I

4     don't think it sounds like it is much concellation to

5     them.  The idea that you could entice three eight or

6     nine-year-old girls who are playing in their yard into

7     your apartment that quickly and take the pictures you

8     took, suggests characteristics of you that raise very

9     serious questions about the sentence that will deter you.

10    This isn't just about a moment of weakness.  This isn't

11    just about one victim that you couldn't stop victimizing.

12    There's a pattern here of grooming and abusing very young

13    girls.  As far as deterrence with your history and

14    characteristics, I have to address the report of Dr.

15    Krueger because that's the only medical report I have in

16    front of me.  If read at face value would suggest that

17    the likelihood of you recidivating is low.  That you are

18    not psychopathic.  You are not an abuser.  You are low

19    risk care for sexual recidivism.  That you are have low

20    risk in the 2.5 percentile in terms of risk.  In his

21    conclusion and recommendations, quote, his risk of

22    another sexual crime is low.  If all I had in front of me

23    was this report, I would have to seriously question what

24    was the need for a long sentence to deter you or protect

25    the public from you.  The difficulty I have -- several

1    difficulties with Dr. Krueger's report.  First, I don't

2    believe he viewed the images either from Connecticut or

3    Virginia.  I don't believe -- it is not reported in his.

4    He doesn't say that he did in his report if I'm correct.

5    He read federal criminal complaint and police reports but

6    I don't believe those had pictures.

7          Second, it is my understanding that the use of

8    polygraph is growing ever more popular in connection with

9    the sex offenses I can't name the study but I relied upon

10   in earlier sentencings of sexual predators, particularly

11   children have difficulty lying about it.  While it

12   doesn't prevent further crimes, it does lead to detection

13   of crime.  I was surprised that Dr. Krueger would rely

14   almost exclusively on your self report and not subject

15   you to the polygraph.  I'm not an expert.  I guess he is.

16         The last difficulty I have with the report is

17   what you self-reported is not accurate.  You said you

18   didn't have any penetrative sex with her, and one of the

19   images shows impartially that you did.  You denied the

20   conduct in Virginia which and I understand your position

21   here today that you don't want to speak to it but

22   certainly the court has accepted it based on the police

23   and court reports that you engaged in sexual conduct with

24   the 15 year old, you engaged in the sex abuse of the

25   eight and nine year olds that went into your apartment.

1   You also indicated that again to Dr. Krueger and he

2   relied upon this that you hadn't meant to distribute the

3   photographs that the program just distributed them.  As I

4   mentioned that's not the fact.

5          The fact that the doctor would at page 6 credit

6   your statement that you felt you were in 100 percent or

7   complete control of your sexual behavior and he accepts

8   that statement at face value.  I'm not a doctor and I'm

9   certainly not a specialist in sexual predators, but I

10  don't know how you can say you are in complete control of

11  your sexual behavior when you sexually assault an eight

12  year old girl and take pictures of it.  So while Dr.

13  Krueger's report is the only one I have in front of me

14  evaluating you on a psychiatric basis, he does conclude

15  you are a pedophile.  I don't think that's disputed.

16  Otherwise I really, I do not credit his conclusion that

17  you are a low risk of recidivism.  I think the Virginia

18  incidents which you deny to him but which I found

19  happened and more than what he questioned you about the

20  ones that were spoken to today about the victim in

21  Virginia's mother suggests very strongly that you are not

22  in completely control and that you are likely to

23  recidivate.

24         I would ask at this time, Mr. Oehne, if you

25  would please rise so the court may impose the sentence.

1      I'm sorry.  I need another moment.

2              It is the sentence of this court to impose upon

3      you on Count One a sentence of 360 months with respect of

4      imprisonment.  With respect to Count Two to impose upon

5      you a sentence of 180 months to be served consecutively

6      for a total of 540 months or 45 years.  It is the

7      sentence of this court to impose upon you a period of

8      supervised release of life.  It is the court's obligation

9      to impose a special assessment of $100 on each count for

10     a total obviously of $200.  The court imposes no fine

11     because it finds you cannot pay one.

12             With respect to the period of incarceration, the

13     court recommends the Bureau of Prisons provide to Mr.

14     Oehne any and all therapy, rehabilitation or modalities

15     that could be made available to him in connection with

16     the conduct evidenced by his crime.

17             With respect to the period of supervised

18     release, the court imposes the standard conditions of

19     supervised release.  The court also imposes the mandatory

20     conditions, number one, you not commit another crime.

21     Number two, that you not lawfully possess a controlled

22     substance; Four, that you refrain from unlawful use of a

23     controlled substance and submit to periodic tests.  Six,

24     you pay the assessment I've imposed as well as any

25     restitution order that may be later imposed within the

1    next ninety days; Seven, that you report the address

2    where you reside and any subsequent change of residence

3    to the Probation Office responsible for supervision and

4    register as a sexual offender in any state where you

5    reside, are employed or are a student;  Eight, that you

6    cooperation of the collection of a DNA sample.  In

7    addition to these conditions, the court imposes the

8    following special conditions: One, you should avoid all

9    contact with any victim in the subject offense of

10   conviction, including but not limited to the minor victim

11   in this case but also any other minor victims that may be

12   identified; Two, that you participate in sexual offender

13   treatment as approved by the United States Probation

14   Office and abide by all policies and procedures of any

15   program you are enrolled in by the Probation Office which

16   may include polygraph testing; Three, the defendant is

17   not to use a computer, Internet-capable device or similar

18   electronic device to access child pornography or

19   communicate whether with any individual or group for

20   purpose of promoting sexual relations with children.  The

21   defendant shall consent to the use of any computer

22   programming to monitor the suspected computer use on any

23   computer owned or controlled by the defendant.  The

24   program or programs used will be designed to identify for

25   the Probation Office all viewing, downloading, uploading,

1    transmitting or using any images with content for a

2    sexual nature.  Otherwise known as suspect computer use.

3    Such suspect computer use shall be identified by the

4    program and/or the Probation Office through the screening

5    of the defendant's computer usage for certain keywords,

6    phrases and images.  The defendant shall pay all or a

7    portion of the cost associated with such computer

8    monitoring based on the ability to pay as determined

9    first by the Probation Office.  Four, the defendant shall

10   not associate with children under the age only 18 except

11   in the presence of a responsible adult who is aware of

12   the nature of the defendant's background, current offense

13   who has been approved by the Probation Office.  The

14   defendant is further prohibited from holding any position

15   of authority or guidance over children or youth groups

16   involving individuals under the age of 18.

17        Five, the defendant shall permit the personal

18   residence, office or vehicle to search conducted by the

19   probation office at a reasonable time and in a reasonable

20   manner based upon reasonable suspicion of contraband or

21   evidence of a violation of a condition of release

22   including the presence of sexually-explicit material

23   involving minors.  Failure to submit to such a search may

24   be grounds for revocation.  The defendant is responsible

25   to warn or advise any other residence or occupants of the

1    premises that he occupies or the vehicle he is in, may be

2    subject to a search pursuant to this condition.

3            Six, the defendant shall participate in a

4    program approved by the Probation office for mental

5    health treatment.  The defendant shall pay all or a

6    portion of the cost associated with such treatment based

7    on the defendant's ability to pay as determined first by

8    the Probation Office.

9            Seven, the defendant shall not possess

10   ammunition, firearms or other dangerous weapon.

11           Eight, as directed by the Probation Office, the

12   defendant shall notify third parties of risks that may be

13   occasioned by the defendant's criminal record or personal

14   history or characteristics and shall permit the probation

15   office to make such notification and confirm the

16   defendant's compliance with such notification

17   requirement.

18           Nine, the defendant shall provide the Probation

19   Office with access to any requested financial records

20   including but not limited to the telephone bills and

21   credit card statements.  And that applies not only until

22   the satisfaction of his financial obligations as may

23   exist but also in order to supervise his expenditures

24   which may be in connection with the child pornography.

25           I thought that there was an exception to the

1    contact with children to if and when he has

2    grandchildren, am I mistaken in my recollection of that?

3        MS. PATEL:  You are not.  We didn't request it

4    because we weren't aware in our additional conditions but

5    your Honor can make an exception for his grandchild.

6        THE COURT:  If and when he has grandchildren, I

7    suspect the grandchild will be older than 18 so none of

8    these conditions will apply.  If I was mistaken in that

9    or great grandchildren that's an exception so long as his

10   son or his children's son or whoever are aware of the

11   criminal history of the defendant.  I'm not sure if I

12   made it clear in connection with the fourth condition, I

13   said he shouldn't associate with children, that includes

14   not loitering around playgrounds, schools or arcades or

15   any places where children under the age of 18 congregate.

16       The defendant shall also not associate with or

17   have contact with other convicted sexual offenders or

18   others considered inappropriate by the United States

19   Probation Office because of their connection to sexual

20   abuse or sexually explicit materials involving minors

21   unless as part of an approved counseling group.

22       I guess I will add as the tenth condition to

23   make it absolutely clear, the defendant is

24   prohibited from accessing or possessing sexually explicit

25   material involving minors.

1           Anything about the sentence, that's unlawful or

2     that I have overlooked?

3           THE PROBATION OFFICER:  No, your Honor.

4           MS. PATEL:  Your Honor, for the record, is it a

5     nonguideline sentence?

6           THE COURT:  That's a good question.  It is a

7     nonguideline sentence.

8           MS. PATEL:  Nothing illegal.  I want to be

9     clear.

10          THE COURT:  It has to be reflected in the

11    Statement of Reasons.  It obviously is below the

12    guidelines.  I obviously considered the guidelines.  But

13    it is my conclusion that while this sentence needs to be

14    extremely long in light of the nature and circumstances

15    of the two offenses of conviction and the history and

16    characteristics of the defendant, particularly as they

17    relate to the issue of deterrence and protection of the

18    public.  That I did not impose a guideline sentence, one,

19    because I think all of those purposes and factors are

20    aptly considered in the sentence that I imposed. Two,

21    because I think it is necessary to somehow credit the

22    defendant for albeit perhaps late, nonetheless pleading

23    guilty and avoiding a trial in which the victim herself

24    or certainly her parents might have to have testified and

25    the defendant I think is to be credited in some respect

1    for that.  And I think for his statements today where I

2    think he has at least today acknowledged the severity of

3    his conduct, the harm of his conduct caused and the

4    seriousness of it.

5         Is there any question, Attorney Riccio, from the

6    defendant?

7         MR. RICCIO II:  No, your Honor.  As far as

8    designation, I think that I would ask for Virginia.  I

9    know that Buttner might be close but as close to Virginia

10   as possible.

11        THE COURT:  The court will recommend that in the

12   judgment.  If there is not anything further, Mr. Oehne, I

13   need to advise you of the right you have and was reserved

14   expressly to you in the Plea Agreement.  That's your

15   right to appeal my sentence.  You also have the right I

16   believe expressly reserved to appeal despite your guilty

17   plea, the ruling I made on the suppression.  I would urge

18   you to direct Attorney Riccio today to file a Notice of

19   Appeal.  Not that anyone likes to be appealed.  I think

20   that's your intention.  That's what you want to do.

21   That's what you should do for your interest.  I think

22   that the difficulty is once he leaves here today, you may

23   have difficulty reaching him and he only has 14 days.

24   You only have 14 days to file that notice.  If it isn't

25   filed within 14 days, physically received in our Clerk's

1    Office within 14 days from today, you can't take an

2    appeal.  You would have lost it.  If you don't decide to

3    tell Attorney Riccio to file it today before he leaves

4    you and you can't reach him, you can file it.  The

5    problem with that is you are in custody.  You are at the

6    control of the warden and the systems he has in place in

7    the mail.  Generally we allow a person to file from the

8    day it was put in the hands of the paralegal or assistant

9    warden at the facility.  That doesn't apply with this

10   notice.  It has to be received in the Clerk's Office down

11   the hall here today 14 days from today so I urge you to

12   speak with Attorney Riccio with respect to taking this

13   Notice of Appeal before he leaves your presence today.

14   Do you understand all of that?

15             THE DEFENDANT:  Yes, ma'am.

16             THE COURT:  Anything further the court has to

17   take up?

18             MS. PATEL:  Nothing from the government.

19             THE COURT:  I would like to thank the Probation

20   Officer for all of the work he put into this case.  He

21   always does a wonderful job so I don't think to thank him

22   for the good service he provides to the court but I think

23   this case was a particularly challenging one and I

24   appreciate his efforts in that respect.  Unless there's

25   anything further, the court will stand in recess.

1       (Whereupon, the above proceeding adjourned at 05:10

2   p.m.)

3

4

5   COURT REPORTER'S TRANSCRIPT CERTIFICATE

6   I hereby certify that the within and foregoing is a true

7   and correct transcript taken from the proceedings in the

8   above-entitled matter.

9

10   /s/  Terri Fidanza

11   Terri Fidanza, RPR

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25